UNITED STATES of America, Plaintiff,

v.

Miguel A. SANTIAGO, Defendant.

No. 94–CR–0002–B.

United States District Court,
D. Wyoming.

March 7, 1994.

John R. Green, Asst. U.S. Atty., Cheyenne, WY, Captain Jeffrey J. Sweeney, Sp. Asst. U.S. Atty., Francis E. Warren AFB, Cheyenne, WY, for plaintiff.

Ronald G. Pretty, Cheyenne, WY, for defendant.

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

BRIMMER, District Judge.

The above-entitled matter having come before the Court on the Defendant's Motion to Suppress, and the Court having reviewed the materials on file herein, having heard oral argument from the parties, and being fully advised in the premises, hereby FINDS and ORDERS as follows:

### Factual Background

Defendant Santiago was arrested on December 15, 1993, for driving while under the influence of an intoxicant, specifically, alcohol, on Warren Air Force base in violation of Wyo.Stat. § 31–5–233 (1989).[1] He filed the

---

1. 18 U.S.C. § 7 (1988) vests this Court with jurisdiction over, *inter alia*, crimes that are committed on government property, which would include the air force base. Moreover, pursuant to the Assimilative Crimes Act, 18 U.S.C. § 13 (1988) ("ACA"), Congress adopted state law as

present motion to suppress, claiming that the detaining officer lacked probable cause to stop his car, and further, that the officer lacked probable cause to administer a breathalyzer test. With respect to this latter claim, the defendant also asserted that the officer who administered the breathalyzer test was not a "peace officer" as required by the Wyoming Implied Consent Act, Wyo. Stat. § 31–6–102(a)(i)(C) (1989).

The facts relating to this case are straightforward. The government's sole witness at the hearing on this motion was Airman First Class Duke Hernandez. Hernandez initially testified that he was sworn in as a federal agent and at no time did he act under color of state law. He then testified that on the evening of December 15, 1993, he was working at the entry gate to the base. Pursuant to authorization from the chain of command, Airman Hernandez was instructed to conduct a "random vehicle inspection," also known as a "base entry point check." The purpose of this inspection was to check vehicles to see if they contained either government property, contraband and/or classified information; the check was not intended as a random sobriety checkpoint. Airman Hernandez was instructed to check every third car in accordance with standard procedure.

At approximately 1:40 a.m., Airman Hernandez testified that he first saw the defendant's vehicle approximately 50 feet from the base, and that the car was "weaving" from side to side, although it never left its lane. The defendant's car was the third one and was therefore subject to the random check. When the car approached the checkpoint, the window had already been rolled down. Hernandez testified that he explained to the driver and sole occupant of the car, the defendant, that his car was subject to this random check. During the course of his explanation to the defendant regarding the check, Hernandez testified that he noticed a

"slight" odor of alcohol from the car and that the defendant's eyes were "glassy and bloodshot." In spite of these indicia of possible drunk driving, Hernandez testified that he did not, at this time, think that the defendant was intoxicated. Hernandez also indicated that the defendant "consented" to the vehicle inspection.

Hernandez then testified that in order to effectuate the random vehicle inspection without impeding the flow of traffic into and out of the base, he directed the defendant to pull his car forward onto the base and then to move over to a lane on the right hand side. In the process of moving the car to that spot, Hernandez testified that the defendant "almost" hit some of the cones and "almost" ran onto the sidewalk. Hernandez then approached the vehicle and told the defendant to turn off his engine. Hernandez then asked the defendant to produce his driver's license, registration and proof of insurance. He testified that the defendant did in fact produce those documents without any difficulty. While the defendant was collecting these documents, Hernandez testified that he sensed a "strong" odor of alcohol emanating from the car. It was at this point that Hernandez believed that the defendant was potentially driving while under the influence of alcohol. He further testified that in his opinion, if the defendant had said that he wanted to leave at that time, Hernandez would have used reasonable force to detain him because of the possibility of him being a drunk driver.

Hernandez detained the defendant and proceeded to conduct three separate field sobriety tests which were designed to determine whether the defendant was in fact intoxicated. The tests were: (1) an horizontal eye gaze test; (2) a walk-turn test; and (3) a one-leg stand test. Hernandez testified that the defendant's "score" on the first two tests

the federal rule of decision, indicative of its intention that federal law should "conform the criminal law of federal enclaves to that of local law except in cases of specific federal crimes." See United States v. Mayberry, 774 F.2d 1018, 1020 (10th Cir.1985) (citation omitted). As the Mayberry court noted, "the Act fills gaps in the federal law by providing a set of criminal laws for federal reservations." Id. (citation omitted).

Thus, Wyoming law regarding driving under the influence of an intoxicant is the applicable substantive law in this case—not of its own force, but because it has been adopted and incorporated as federal law in the ACA. See Puerto Rico v. The Shell Co. (P.R.), Ltd., 302 U.S. 253, 265–68, 58 S.Ct. 167, 172–74, 82 L.Ed. 235 (1937).

was such that, according to a chart that he carried with him, the defendant fell within the "shaded area," which indicated possible intoxication. As for the third test, Hernandez testified that the defendant started to take the test but then exclaimed "I cannot do this."

Based on the results of these field sobriety tests, Hernandez concluded that the defendant was intoxicated. The defendant was then transported by Hernandez and two other officers to another building on the base in order to administer a breathalyzer test. Hernandez testified that the defendant again consented to take this test, and that at 2:20 a.m., the defendant's blood-alcohol level was 0.167%, and that at 2:22 a.m., his blood-alcohol level was 0.159%. The defendant was subsequently advised of his *Miranda* rights and arrested on a charge of driving while under the influence of alcohol.

As noted, the defendant has filed a motion to suppress the breathalyzer results, claiming that there was no probable cause to stop the vehicle *ab initio*. He also argues that there was no probable cause to administer the breathalyzer test and that even if there was probable cause, Hernandez was not empowered under the statute to give the test since he was not a "peace officer." The Court will address these arguments in turn.

### Discussion

#### A. The Initial Stop

##### 1. Was it a "Seizure" Under the Fourth Amendment?

The defendant's first argument is that the officers lacked "probable cause" to make the initial stop of the defendant's car at the

checkpoint gate of the base, and in so doing, effectuated an unconstitutional "seizure." *See United States v. Martinez–Fuerte*, 428 U.S. 543, 556, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116 (1976) (noting that checkpoint stops are "seizures" within the meaning of the Fourth Amendment); *see also California v. Hodari D.*, 499 U.S. 621, 624–26, 111 S.Ct. 1547, 1549–51, 113 L.Ed.2d 690 (1991); *Brower v. County of Inyo*, 489 U.S. 593, 597, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989). He argues that because this seizure was unconstitutional, any evidence that resulted from the seizure, including the breathalyzer results, was tainted and must be suppressed under the "fruit of the poisonous tree" doctrine. *See Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963).

It is important to understand that the legal analysis of this claim is completely unrelated to, and independent of, the issue of whether the defendant was intoxicated and whether it was proper to subject him to a breathalyzer test. This motion is grounded in the question of whether a random vehicle inspection conducted on a military base, presumably in furtherance of the government's interest in security, is consistent with the dictates of the Fourth Amendment.[2] After careful consideration of this issue, the Court is of the opinion that although the government did not possess any cause or suspicion when it initially stopped the defendant's car at the checkpoint,[3] the seizure was nonetheless "reasonable" under the circumstances and therefore it did not violate the Fourth Amendment.

The Fourth Amendment states that:

[t]he right of the people to be secure in their persons, houses, papers, and effects,

**2.** The Court's analysis and conclusion on this important legal question is the product of the Court's own independent research. The defendant's motion to suppress contains no case law authority in support of its position that the initial seizure, which was the result of the random vehicle inspection, was unconstitutional. Likewise, the government did not file a written opposition to the defendant's motion and therefore did not provide any case law authority that would support its position that this seizure was constitutional.

At oral argument, the only reference by the government to the constitutionality of the initial

stop was a one sentence statement to the effect that the initial stop was permissible because the government has a legitimate interest in conducting random vehicle inspections.

**3.** Although Hernandez testified that the defendant's car was "weaving" in its own lane as it approached the checkpoint, he testified at the hearing that this weaving, by itself, did not lead him to think that the defendant was intoxicated. As a result, it follows that the *only* basis for the initial stop of the car was to conduct the random vehicle inspection.

against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or Affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV (emphasis added). The Supreme Court's early interpretations of the Fourth Amendment recognized the tension between the so-called "warrant" clause[4] and the "reasonableness" clause.[5] This tension resulted in inconsistent judicial decisions. *Compare Harris v. United States*, 331 U.S. 145, 150, 67 S.Ct. 1098, 1101, 91 L.Ed. 1399 (1947) (stressing that a warrantless search may be constitutional if it satisfies the "test of reasonableness") *with Johnson v. United States*, 333 U.S. 10, 15–17, 68 S.Ct. 367, 369–71, 92 L.Ed. 436 (1948) (emphasizing that searches must be conducted under the authority of a search warrant).

By the late 1960's, "the preference for a warrant had won out, at least rhetorically." *California v. Acevedo*, 500 U.S. 565, 581, 111 S.Ct. 1982, 1992, 114 L.Ed.2d 619 (1991) (Scalia, J., concurring). In *Acevedo*, Justice Scalia wrote:

[t]he Fourth Amendment does not by its terms require a prior warrant for searches and seizures; it merely prohibits searches and seizures that are 'unreasonable.' What it explicitly states regarding warrants is by way of limitation upon their issuance rather than requirement of their use. See *Wakely v. Hart*, 6 Binney 316, 318 (Pa.1814).

*Id.* Noting that the Court's own cases "lurched back and forth between imposing a categorical warrant requirement and looking to reasonableness alone[,]" which resulted in an "inconsistent jurisprudence[,]" *id.* at 582–83, 111 S.Ct. at 1992–93, Justice Scalia advocated that "the path out of this confusion should be sought by returning to the first principle that the 'reasonableness' requirement of the Fourth Amendment" is sufficient. *Id.* at 583, 111 S.Ct. at 1993.

Although Justice Scalia's concurrence in *Acevedo* was not joined by any other justices, the Court's most recent cases interpreting the Fourth Amendment have started down Justice Scalia's path and have begun to focus predominantly on the reasonableness of the search or seizure rather than the presence *vel non* of a warrant. Statements like "[t]he touchstone of the Fourth Amendment is reasonableness[,]" *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991) (citation omitted), "reasonableness is still the ultimate standard[,]" *Soldal v. Cook County, Illinois*, 506 U.S. ——, ——, 113 S.Ct. 538, 549, 121 L.Ed.2d 450 (1992) (quoting *Camara v. Municipal Court of San Francisco*, 387 U.S. 523, 539, 87 S.Ct. 1727, 1736, 18 L.Ed.2d 930 (1967)), and "[t]he Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable[,]" *Jimeno*, 500 U.S. at 250, 111 S.Ct. at 1803 (citing *Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)), abound in recent cases. As a result, it appears that the Supreme Court's current approach to the resolution of Fourth Amendment search and seizure claims is in fact guided by the standard of reasonableness, which involves a balancing of the relative interests of the government against the individual's privacy interests.[6]

4. "[A]nd no Warrants shall issue, but upon *probable cause*, supported by Oath or Affirmation ..." U.S. CONST amend. IV (emphasis added).

5. "The right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable searches and seizures* ..." U.S. CONST. amend. IV (emphasis added).

6. To be sure, some of the cases of the Supreme Court and the lower federal courts still cite *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) for the proposition that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Id.* at 357, 88 S.Ct. at 514 (footnotes omitted).

Nonetheless, the more recent jurisprudential approach taken by the Supreme Court has clearly vitiated this statement from *Katz* to a significant extent, leaving it as more of a remnant of another doctrinal era when the warrant clause dominated. Under the Court's present approach, the absence of a warrant no longer makes a search unreasonable *per se;* rather, the existence of a warrant is, as discussed below, one factor to be considered in determining the ultimate issue of reasonableness.

Although the critical inquiry under the Fourth Amendment is whether the search or seizure was "reasonable," this in no way implies that the presence or absence of a warrant is irrelevant. To the contrary, whether the officers possessed a warrant based on probable cause is one factor that should always be considered in determining the reasonableness of the search or seizure. *See Griffin v. Wisconsin,* 483 U.S. 868, 873, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987); *United States v. Karo,* 468 U.S. 705, 717, 104 S.Ct. 3296, 3304, 82 L.Ed.2d 530 (1984). The existence of a warrant is, however, only one factor to be weighed in the "careful balancing of governmental and private interests." *Soldal,* 506 U.S. at ——, 113 S.Ct. at 549 (quoting *New Jersey v. T.L.O.,* 469 U.S. 325, 341, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985)). What is reasonable "depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *United States v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985).

The Supreme Court succinctly summarized this point in *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), stating that:

> our decision in [the companion case of *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989)] *reaffirms the long-standing principle that neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance* (citations omitted).

*Von Raab,* 489 U.S. at 665, 109 S.Ct. at 1390 (emphasis added). The teaching of *Skinner* and *Von Raab* is that in certain contexts, a search can be reasonable even in the absence of any level of individualized suspicion. The "certain contexts" referred to above have involved cases where the government's asserted interests vis-à-vis the individual's privacy interests simply make it impracticable to require any level of suspicion prior to the effectuation of the search or the seizure. In *Von Raab,* the Supreme Court stated:

> [a]s we note in [*Skinner*], our cases establish that where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, *it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impracticable to require a warrant or some level of individualized suspicion in the particular context.*

*Id.* at 665–66, 109 S.Ct. at 1390–91 (citation omitted) (emphasis added); *see also Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396 (1979) (stating that the constitutionality of a particular search or seizure "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.").

*Skinner* and *Von Raab* involved the constitutionality of drug testing practices instituted by the federal government. In *Skinner,* the Federal Railroad Administration, acting pursuant to a statutory grant of authority, promulgated regulations governing toxicological testing for drug and alcohol usage. The purpose of the testing was not to assist in prosecuting employees who were tested positive; it was "to prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol or drugs." *Skinner,* 489 U.S. at 620–21, 109 S.Ct. at 1415 (citing 49 C.F.R. § 219.1(a) (1987)) (footnote omitted). Railroad employees filed suit claiming that the government had no individualized suspicion that would justify forcing them to submit to drug testing. The Supreme Court found that the requirement of a warrant would "significantly hinder[], and in many cases frustrat[e], the objectives of the Government's testing program." *Id.* at 624, 109 S.Ct. at 1417. In view of the significant governmental interest in safety, the Court upheld the regulation even though the government lacked any level of individualized suspicion for requiring individuals to submit to testing. *Id.*

In the companion case of *Von Raab,* the United States Customs Service enacted regulations requiring employees to submit to urinalysis testing before they could be considered for transfers or certain promotions.

Once again, Fourth Amendment challenges were brought on the basis of an asserted lack of individualized suspicion. The Court first noted that the regulation prohibited the introduction of the results of the drug tests in a criminal prosecution without the employee's consent. The purpose of the regulations was to "deter drug use among those eligible for promotion to sensitive positions within the Service and to prevent the promotion of drug users to those positions." *Von Raab,* 489 U.S. at 666, 109 S.Ct. at 1391. The Court concluded by stating that "[t]hese *substantial* interests, no less than the Government's concern for safe rail transportation at issue in [*Skinner*] present a special need that may justify departure from the ordinary warrant and probable-cause requirements." *Id.* (emphasis added).

Another "context" besides drug testing which has culminated in Fourth Amendment challenges based on the lack of individualized suspicion involves sobriety checkpoints. The Supreme Court visited this issue in *Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). In *Sitz,* the State of Michigan enacted guidelines setting forth procedures for creating random checkpoints that were designed to look for drunk drivers. The Court phrased the issue in *Sitz* as a challenge to the constitutionality of "the initial stop of each motorist passing through a checkpoint and the associated preliminary questioning and observation by checkpoint observers." *Id.* at 450–51, 110 S.Ct. at 2485–86. This is remarkably similar to the issue raised in the present case.

The Court's analysis began with an acknowledgement of the "magnitude of the drunken driving problem [and] the States' interest in eradicating it." *Id.* at 451, 110 S.Ct. at 2485. The state's substantial interest in handling this problem and the empirical evidence supporting the severity of the problem, coupled with the fact that the re-

sulting intrusion on individual motorists was seen as "slight," led the Court to conclude that the initial stop of the motorists, without any individualized suspicion, was nonetheless "consistent with the Fourth Amendment." *Id.* at 455, 110 S.Ct. at 2488.

The common denominator between *Skinner, Von Raab* and *Sitz* is that the asserted interest of the government was sufficiently substantial so as to justify a small infringement on the privacy of the individual *in order to further* the government's interest.[7] The Court must now apply these principles to the facts of this case.

### 2. Application to the Case at Bar

In the present case, the initial stop of the defendant's car was predicated on the fact that the Air Force base was conducting a random vehicle inspection. The discussion above illustrates the fundamental flaw with the defendant's argument that the officer lacked "probable cause" to stop the car: it *assumes,* incorrectly so, that probable cause is a necessary prerequisite to a seizure. *Skinner, Von Raab* and *Sitz* all undercut the defendant's argument. As a result, it is clear that the mere fact that the officer lacked some level of individualized suspicion does not automatically make the search unconstitutional. Nonetheless, in order for the search to be valid under the Fourth Amendment, the government must show that it had a substantial interest in conducting the random vehicle inspections and that this interest outweighs the intrusion on the individual's privacy interests.

The purpose of the random investigation, as attested to by Airman Hernandez, was to check for government property, contraband and classified information—in essence, as a security measure. In determining whether the government's interest in this case is "substantial," this Court is mindful of the longstanding deference that the Judicial Branch has given to decisions of the Execu-

---

7. In that regard, it is possible to reconcile *Prouse* with the cases cited above. In *Prouse,* the Supreme Court found that Delaware's decision to conduct random vehicle stops to check for unlicensed drivers and unsafe vehicles was not shown to be substantial enough to warrant the resulting intrusion of an individual's privacy. The Court found no evidence that demonstrated

that random stops were necessary to promote the government's asserted interests. *See Prouse,* 440 U.S. at 658–63, 99 S.Ct. at 1398–1401.

In contrast, *Skinner, Von Raab* and *Sitz* all involved cases where the government's interest was shown to be substantial enough to justify the intrusion.

tive Branch, especially when those decisions relate to matters of national security. In that regard, the Supreme Court has stated:

> unless Congress has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs.

*Department of the Navy v. Egan,* 484 U.S. 518, 530, 108 S.Ct. 818, 825, 98 L.Ed.2d 918 (1988) (collecting cases); *see also Franklin v. Massachusetts,* —— U.S. ——, ——, 112 S.Ct. 2767, 2784, 120 L.Ed.2d 636 (1992) (acknowledging the "principle of judicial deference that pervades the area of national security."). *See generally Central Intelligence Agency v. Sims,* 471 U.S. 159, 167–80, 105 S.Ct. 1881, 1886–93, 85 L.Ed.2d 173 (1985).

■ Of course, deference does not mean abdication of the judicial function. Deference is a function of the separation of powers doctrine and stems from a recognition that certain decisions are more within the domain of the representative branches of government and as a result, the judiciary should afford more weight to their decisions. In the present case, the Court is of the opinion that the government's asserted interest in this case is of the same magnitude as the interests asserted in *Skinner, Von Raab* and *Sitz.* No one can seriously doubt the interest of the armed forces in protecting classified information and in regulating the use of contraband by members of the armed forces. Moreover, while there is some degree of intrusion on the defendant's privacy that results from this random vehicle inspection, the imposition is outweighed by the legitimate governmental interests at stake.

As a result, the Court concludes that the actions of Airman Hernandez in this case in making the initial "seizure" of the defendant at the checkpoint, in furtherance of a random vehicle inspection based in part on substantial security interests, is reasonable and therefore does not violate the Fourth Amendment.[8]

## B. *The Breathalyzer Test*

Section 31–6–102(a)(i) of the Wyoming Statutes provides that any person who is arrested for an offense under § 31–5–233, which prohibits driving while under the influence of an intoxicant, may be required to submit to a "test[ ] of his blood, breath or urine for the purpose of determining the alcohol concentration or controlled substance content of his blood." Subsections (A), (B) and (C) of that statute are prerequisites to the administration of any of these tests, and those subsections require that the test be given: (A) "[i]ncidental to a lawful arrest"; (B) that the test be "[g]iven as promptly as possible after the arrest"; and (C) that the test be "[a]dministered at the direction of a peace officer who has probable cause" to believe that the individual was driving in violation of § 31–5–233.

In the present case, the defendant has not asserted that the breathalyzer tests were conducted in violation of subsections (A) of (B). He does contend, however, that subsection (C) was violated because: (1) there was no probable cause to believe that he violated § 31–5–233; and (2) even if there was probable cause, Airman Hernandez was not a "peace officer" as that term is defined in § 7–2–101(a)(iv) (Michie Supp.1993).

### 1. *Probable Cause*

■ In the seminal decision in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court recognized that certain limited investigative stops did not rise to the level of a "seizure" and could thereby be reconciled with the Fourth Amendment as long as there was "some minimal level of objective justification[,]" *see I.N.S. v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984). That level of justification requires more than the officer's "inchoate and unparticularized suspicion or hunch," *Terry,* 392 U.S. at 27, 88

---

8. One final point is noteworthy. At the suppression hearing, the government attempted to justify the random vehicle inspection by arguing that the defendant "consented" to it.

  Even if the defendant, whose blood alcohol level was approximately 0.16%, could voluntarily and knowingly give his "consent," that argument fails to acknowledge that the "intrusion" into the defendant's privacy occurred at the moment the stop was effectuated, which was *before* the defendant could have consented.

S.Ct. at 1883, but less than full-blown "probable cause." *See United States v. Sokolow*, 490 U.S. 1, 7–8, 109 S.Ct. 1581, 1585–86, 104 L.Ed.2d 1 (1989). A limited investigatory stop under *Terry* may be conducted where the officer has "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880. In making this determination, a court should consider "the totality of the circumstances—the whole picture." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). *Terry* was premised on a realistic understanding of the world of law enforcement and that:

> it is impractical to demand strict compliance with the Fourth Amendment's ordinary probable-cause requirement in the face of ongoing or imminent criminal activity demanding 'swift action predicated upon the on-the-spot observations of the officer on the beat.'

*Sokolow*, 490 U.S. at 12–13, 109 S.Ct. at 1588 (Marshall, J., dissenting) (quoting *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879).

▄ In the present case, the Court has already determined that the initial stop of the defendant was permissible. The question posed here is whether Airman Hernandez's contacts with the defendant at both the checkpoint and after he instructed the defendant to pull forward for the purpose of conducting the random inspection, gave him a reasonable, articulable suspicion that the defendant might have been driving his vehicle while under the influence of alcohol.[9] The following facts were attested to by Airman Hernandez relative to his first encounter with the defendant: (1) that his car was "weaving," albeit within its own lane; (2) that it was approximately 1:40 a.m.; (3) that he noticed a "slight" odor of alcohol emanating from the car area; and (4) that the defen-

dant's eyes were glassy and bloodshot. He further testified that after he advised the defendant of the purpose of the stop and told him to pull forward and off to the right, the defendant "almost" hit a cone and "almost" hit the curb. Finally, Hernandez testified that during his second encounter with the defendant, he noticed a "strong" odor of alcohol. Hernandez also testified that although he smelled alcohol, he did not know how much the defendant might have had to drink or when he stopped drinking.

The question presented here is whether these facts constitute reasonable, articulable suspicion that would permit Hernandez to have conducted a limited investigatory stop to investigate a possible charge of drunk driving. The answer here is self-evident. This is not a case involving hunches, speculation or guesswork. Hernandez testified to five or six different facts which, when taken in their totality, constitute a reasonable basis for proceeding with further investigation.

As a result, Hernandez made the defendant perform the three field sobriety tests discussed above. The results of those tests placed the defendant in the "shaded area" of Hernandez's reference chart, which indicated that he was probably intoxicated. Thus, based on all of the facts known to Hernandez at this time, it is apparent that what started off as a legitimate *Terry* stop escalated into probable cause to arrest or "seize" the defendant based on an alleged violation of § 31–5–233.

▄ Moreover, the fact that this arrest was made without an arrest warrant is irrelevant. It is well-settled law that if a police officer has probable cause to believe that a person has committed or is presently committing a crime, then he may effectuate a warrantless arrest of the individual without violating the Fourth Amendment. *See Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct.

---

9. The preceding discussion has implicitly exposed the defect in the defendant's argument that "probable cause" was necessary to stop the car. Under *Terry*, a limited investigative stop may be conducted based on a reasonable, articulable suspicion that "criminal activity may be afoot." *Terry*, 392 U.S. at 30, 88 S.Ct. at 1884. If, during the course of that investigation, the officer learns additional information that would lead

him to believe that a crime has occurred or is occurring, then the issue becomes whether all of the information possessed by the officer constitutes "probable cause" to effectuate an arrest.

The defendant's argument fails to acknowledge that under *Terry*, a law enforcement officer may have an initial encounter with an individual without probable cause.

1694, 1699, 85 L.Ed.2d 1 (1985) (citing *United States v. Watson,* 423 U.S. 411, 416–18, 96 S.Ct. 820, 824–25, 46 L.Ed.2d 598 (1976)). The determination of probable cause is critical because "[t]he constitutional validity of a warrantless arrest depends upon whether the arresting officer had probable cause." *See Karr v. Smith,* 774 F.2d 1029, 1031 (10th Cir.1985) (quoting *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)); *see also United States v. Laboy,* 979 F.2d 795, 798 (10th Cir.1992) (citation omitted). Thus, the validity of the warrantless arrest depends upon whether "the facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient to warrant a prudent man in believing that an offense has been or is being committed." *Karr,* 774 F.2d at 1031.

In this case, the arrest of the defendant meets this definition based on the results of the field sobriety tests and the facts that led Hernandez to administer those tests initially. Because there was probable cause to arrest the defendant on the grounds that he was driving in violation of § 31–5–233, it was not improper to administer the breathalyzer test. Therefore, the results of that test should not be suppressed on the grounds that there was no probable cause.

### 2. *Peace Officer*

■ The defendant's final argument is that even if there was probable cause to subject him to a breathalyzer test, Hernandez was not a "peace officer" as required by § 31–6–102(a)(i)(C), and as defined in § 7–2–101(a)(iv), and therefore could not properly administer that test.

Section 31–6–102(a)(i)(C) states that a breathalyzer test may be administered by a "peace officer." Section 7–2–101(a)(iv) specifically defines the term "peace officer" to include various positions, all of which share one important, common fact: they are state employees. In the present case, Hernandez testified, and the government did not dispute, that he was commissioned as a *federal* law enforcement officer and did not act for the state. As such, he would not fall within any of the enumerated definitions of a "peace officer" in the statute. Nonetheless, after careful consideration of the purposes behind the requirement that a breathalyzer test be administered by a "peace officer," it is apparent to this Court that the fact that Hernandez was a federal officer is not a valid basis for suppressing the results of the breathalyzer tests.

The State of Wyoming has enacted a law governing who may administer a breath test to an individual suspected of committing a violation of § 31–5–233. That law necessarily lacks any authority *of its own force* on a federal air force base because the state has no power or authority to legislate on behalf of the federal government. Nonetheless, Congress determined in the ACA that it would be appropriate to adopt state criminal law as the federal rule of decision for criminal acts that occur on federal property. The defendant argues that because the ACA adopts state law, then the federal rule of decision is governed by Wyoming law, specifically § 7–2–101, which defines peace officers and does not include federal officials in that definition.

■ While it cannot be disputed that the defendant's argument is literally correct, it is a fundamental canon of statutory construction that a court should not give a "literal reading [to a statute] that would compel an odd result." *See Green v. Bock Laundry Machine Co.,* 490 U.S. 504, 509, 109 S.Ct. 1981, 1984, 104 L.Ed.2d 557 (1989); *see also Public Citizen v. United States Dep't of Justice,* 491 U.S. 440, 454, 109 S.Ct. 2558, 2566, 105 L.Ed.2d 377 (1989) (noting that when literal interpretation of a statute would compel an odd result, a court must search for an interpretation that is more consonant with the statutory scheme).

*Green* involved an interpretive issue over the former Rule 609(a)(1) of the Federal Rules of Evidence, which relates to impeachment through the use of a prior conviction in both the civil and the criminal contexts. Read literally, the rule required that evidence of a prior conviction "shall be admitted" unless the probative value of the evidence outweighed the potential prejudice "to the *defendant.*" FED.R.EVID. 609(a)(1) (emphasis added). Lower courts interpreting this rule had routinely held that this evidence

was admissible without any balancing of the probative value against the prejudice when the prior conviction was being introduced to impeach a *plaintiff*. Those courts reasoned that the rule only mandates a balancing test when the evidence is sought to be admitted against "the defendant."

The Supreme Court granted certiorari to resolve this seemingly "odd" result and concluded that not only was a literal reading of the statute "odd," but such a reading also raised potential equal protection issues. Even Justice Scalia, an ardent proponent of construing statutes in accordance with their plain meaning, stated:

> [w]e are confronted here with a statute which, if interpreted literally, *produces an absurd, and perhaps unconstitutional, result.* Our task is to give some alternative meaning to the word "defendant" in Federal Rule of Evidence 609(a)(1) that avoids this consequence ...

*Green,* 490 U.S. at 527, 109 S.Ct. at 1994 (Scalia, J., concurring) (emphasis added). The Court ultimately concluded that the word "defendant" should be interpreted to mean "criminal defendant," and therefore, impeachment of any civil witness, plaintiff or defendant, based on a prior conviction, was appropriate without balancing the probative value against the possible prejudice.[10] Of course, impeachment by a prior conviction in a civil case could still be excluded under Rule 403.

*Green* thus stands for the proposition that although courts should read statutes literally in order to give effect to the legislative enactment, a literal reading is simply unwarranted when that reading would produce either an unconstitutional or an absurd result. Other courts have gone farther and have stated that not only *should* a court avoid construing

a statute to achieve an absurd result, but that a court is *bound* to construe a statute to avoid an absurd or odd[11] result. *See, e.g., Bailey v. City of Lawrence, Indiana,* 972 F.2d 1447, 1452 (7th Cir.1992); *Hercules Inc. v. United States Environmental Protection Agency,* 938 F.2d 276, 281 (D.C.Cir.1991); *Northrop Corp.,* 811 F.Supp. at 335–36. *But see Pantry, Inc. v. Stop–N–Go Foods, Inc.,* 796 F.Supp. 1171, 1176–77 (S.D.Ind.1992) (noting that a court may not disregard the plain, unambiguous meaning of a statute "even if the court believes the result would be unreasonable.").

Application of *Green's* reasoning to the present case leads this Court to the conclusion that although § 7–2–101(a)(iv) does not include a federal officer in the definition of a peace officer, this literal reading would lead to an absurd result. The absurdity is grounded in the fact that if a federal officer is precluded from administering a breathalyzer test under § 31–6–102(a)(i)(C) to an individual who is arrested on federal property, based on probable cause to believe that the individual was violating § 31–5–233 by driving a motor vehicle while intoxicated, then it stands to follow that *no one* could administer a breath test to that individual.

■ This nation's dual system of sovereignty has evolved into a dichotomy whereby the federal government is deemed to have the authority to intrude into the state's domain, whereas the latter has no authority to interfere in the former's domain. It follows *a fortiori* that a state official would have no authority to administer this type of test, or, for that matter, any test, on federal property. If this Court construes the statute to exclude the power of a federal official to administer this test, then it is appears that no one could administer it. This would, in this Court's

---

10. Around the time that *Green* was decided, Congress had apparently recognized the problem with Rule 609(a)(1) and was in the process of amending it. The final amended version of the rule was enacted after *Green,* and essentially adopts the Supreme Court's interpretation of the word "defendant" to mean "criminal defendant." The new rule uses the word "accused," rather than "defendant," indicating that the rule only applies in the criminal setting.

11. While the majority and concurring opinions in *Public Citizen* might lead one to conclude that there is a distinction between interpreting a statute to achieve an "odd" result and interpreting a statute to achieve an "absurd" result, the Supreme Court has never drawn any type of distinction between "odd" and "absurd" results. Thus, this Court, like many other courts, uses the two terms interchangeably. *See Grand ex rel. United States v. Northrop Corp.,* 811 F.Supp. 333, 335 n. 4 (S.D. Ohio 1992).

 

opinion, produce no less of an absurd result than that which was at issue in *Green.*[12]

In addition, this Court recently reached a comparable result in a similar case. In *Pogue v. Allison et al.*, No. 93–CV–0087–B, slip op. (D.Wyo. Feb. 16, 1994), this Court was faced with the legal question of whether a federal law enforcement officer of the United States Bureau of Indian Affairs ("BIA"), who worked for the Wind River Agency Police Department, could lawfully seize and withhold the plaintiff's driver's license after she had been arrested on an Indian reservation for drunk driving in violation of § 31–5–233. *See id.* at 1–2.

The plaintiff thereafter initiated a suit under § 1983 alleging a violation of due process, claiming that the officer deprived her of her property without notice and an opportunity to be heard. One of the issues before this Court was whether the BIA agent had the lawful authority to seize and withhold her license under Wyoming law. Her argument was that the officer lacked the authority under Title 31 of the Wyoming Statutes to seize her license. While the present case arises under a different statutory scheme, the reasoning of *Pogue* is analogous to the reasoning employed here: that the BIA officers, who were federal employees, had to have the authority to perform these traffic-related stops *on federal property* because no one else could. *Id.* at 6–8.

If federal officials cannot lawfully administer a breathalyzer test on federal property, then it appears that no one could. This Court will not construe Wyoming law to reach such an absurd result. For all of the foregoing reasons, this Court concludes that Airman Hernandez was in fact authorized to execute the breathalyzer test and therefore, the motion to suppress must be denied.

**THEREFORE,** it is

**ORDERED** that the Defendant's Motion to Suppress be, and the same hereby is, **DENIED.**

---

12. It is also arguable that a literal reading might have constitutional ramifications as well since significant federalism concerns over the appropriate role of state and federal governments might be implicated by such a reading. Nonetheless, a "fundamental rule of judicial restraint[,]" *Three Affiliated Tribes of Berthold Reservation v. Wold Eng'g*, 467 U.S. 138, 157, 104 S.Ct. 2267, 2279, 81 L.Ed.2d 113 (1984), re-

quires a federal court to "consider nonconstitutional grounds" for decision "[p]rior to reaching any constitutional questions." *See Jean v. Nelson*, 472 U.S. 846, 854, 105 S.Ct. 2992, 2997, 86 L.Ed.2d 664 (1985) (citing cases). Therefore, this Court intimates no opinion as to any potential constitutional issues relative to a literal reading of this statute.