2009 WY 43

**David R. COLYER, Appellant (Petitioner),**

v.

**The STATE of Wyoming, DEPARTMENT OF TRANSPORTATION, Appellee (Respondent).**

**No. S–08–0183.**

Supreme Court of Wyoming.

March 25, 2009. .

Representing Appellant: Vance Countryman of Vance T. Countryman, P.C., Lander, Wyoming.

Representing Appellee: Bruce A. Salzburg, Attorney General; Robin Sessions Cooley, Deputy Attorney General; Douglas J. Moench, Senior Assistant Attorney General; Michael T. Kahler, Assistant Attorney General.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

VOIGT, Chief Justice.

[¶ 1] The appellant's driver's license was suspended because he refused to submit to a chemical test of his blood alcohol content after a traffic stop. That suspension was affirmed after a contested case hearing and again after a petition for review was filed in the district court. The focal issue is whether the arrest was unlawful, which, if so, would negate the appellant's statutorily implied consent to chemical testing, and would require reversal of the driver's license suspension. We affirm, although not precisely on the basis upon which the hearing examiner and district court determinations rested.

## ISSUE

[¶ 2] The appellant presents the following issue in this appeal:

Whether Wyoming Statutes Section 7–2–106 [ (LexisNexis 2007) ] authorizes a Bureau of Indian Affairs officer to detain and/or arrest a non-Indian person on the Wind River Indian Reservation.

[¶ 3] The State phrases the issue somewhat differently:

[Whether] the district court correctly affirm[ed] the hearing officer's finding that [the] Bureau of Indian Affairs officer [ ] had authority to detain appellant on the Wind River Indian Reservation once he determined that appellant was not Native American, until Fremont County Sheriff's deputies arrived to take control of the scene?

[¶ 4] We will state what we consider to be the dispositive issue as follows: Whether the appellant's detention by a Bureau of Indian Affairs officer on the Wind River Indian Reservation rendered unlawful the otherwise lawful arrest of the appellant by a Fremont County deputy sheriff?

## FACTS

[¶ 5] The facts in this case are not contested. We will set forth those facts of which the deputy sheriff was aware at the time he arrested the appellant for drunk driving:

1. Law enforcement officers in Fremont County received a REDDI (Report Every Drunk Driver Immediately) report at approximately 1:08 a.m., on March 2, 2006. The initial report and pre-arrest follow-up investigation indicated that a 1992 white Cadillac coupe bearing license plate number 10–34CC had driven into a pole and trash can at a convenience store in Riverton. Because the vehicle was registered to a person who resided in nearby Lander, a Fremont County deputy sheriff drove southward out of Riverton toward Lander on U.S. 789 in an attempt to intercept the vehicle.

2. A Bureau of Indian Affairs (B.I.A.) officer radioed that he had located the vehicle headed westward on 17 Mile Road, in an area that is within the Wind River Indian

Reservation. The B.I.A officer advised that "the vehicle was all over the road and had left the road way on the shoulder and then drove back onto the roadway."

3. As the deputy sheriff drove toward the location described by the B.I.A. officer, he heard another B.I.A. officer radio that he had just seen the vehicle and was turning around to catch up with it. The second B.I.A. officer stated that the vehicle had accelerated to about 75 miles per hour in a 55 miles per hour zone, and was driving "all over the road." He also, before the arrest, told the deputy sheriff that the driver of the vehicle had not dimmed his headlights as he approached, and that he had seen the vehicle drift across the fog line on the highway.

4. The second B.I.A. officer stopped the vehicle and detained its driver, the appellant, until the deputy sheriff arrived. The appellant admitted to the B.I.A. officer that he "had been drinking."

5. The deputy sheriff arrived and approached the appellant, who was standing outside his vehicle. The appellant again admitted that he had been drinking, and the deputy sheriff noted a "distinct odor of alcoholic beverage" coming from the appellant, noted that the appellant's speech was very slurred, and noted that the appellant was very unsteady on his feet.

6. At the deputy sheriff's request, the appellant attempted to perform various field sobriety maneuvers, with minimal success. A portable alco-sensor test revealed the appellant's blood alcohol level to be .080%. In response to the deputy's direct question, the appellant answered that he "had drunk way too much to be driving." He was then arrested for driving while under the influence of alcohol.

[¶ 6] In addition to these pre-arrest facts, it is important to note that, after he was arrested, the appellant refused to submit to a chemical test to determine his blood alcohol content. There is also an unverified presumption throughout this record and in the briefs that, had the appellant been a tribal member, he would have been arrested by the B.I.A. officers, rather than being detained for formal arrest by the deputy sheriff.

## STANDARD OF REVIEW

[¶ 7] The question before us—whether the appellant's detention by the B.I.A. officers rendered the subsequent arrest unlawful—is purely a question of law that we review *de novo*. *Worcester v. State*, 2001 WY 82, ¶ 13, 30 P.3d 47, 52 (Wyo.2001); *Marshall v. State ex rel. DOT*, 941 P.2d 42, 44 (Wyo.1997). That review takes place within the context of the statutorily based standards for the review of administrative agency action. *Batten v. Wyo. DOT Drivers' License Div.*, 2007 WY 173, ¶ 6, 170 P.3d 1236, 1240 (Wyo.2007). We may sustain the decision of the lower tribunal on any basis found in the record. *Van Order v. State*, 600 P.2d 1056, 1058 (Wyo.1979).

## DISCUSSION

[¶ 8] This discussion logically must begin with an analysis of the statutory significance of an arrest in the context of driving while under the influence and implied consent to chemical testing for blood alcohol content. Wyo. Stat. Ann. § 31–5–233(b) (LexisNexis 2007) prohibits "driving while under the influence" (DWUI). Wyo. Stat. Ann. § 31–6–102(a) (LexisNexis 2007) provides that a person lawfully arrested for DWUI is "deemed to have given consent" to a chemical test to determine his or her blood alcohol content. Wyo. Stat. Ann. §§ 31–6–102(d) and (f), and 31–6–107(a) (LexisNexis 2007) require the Wyoming Department of Transportation to suspend the driver's license or driving privileges of anyone who, having been lawfully arrested for DWUI, refuses to consent to a chemical test to determine his or her blood alcohol content.

[¶ 9] A person who has been arrested for DWUI and who has refused to consent to a chemical test to determine his or her blood alcohol content may request a hearing to determine the following issues: (1) whether the arresting officer had probable cause to believe the person was driving under the influence; (2) whether the person was placed under arrest; (3) whether the person refused to submit to a chemical test upon request of "the peace officer"; (4) whether, if the per-

son did submit to a chemical test, the result was a blood alcohol concentration of 0.08% or more; and (5) whether the person was advised that his driver's license would be suspended upon refusal to submit to chemical testing. Wyo. Stat. Ann. § 31–6–103(a), (b) (LexisNexis 2007). The hearing is civil, rather than criminal in nature, and the State's burden of proof is the standard civil burden of producing a preponderance of the evidence. *Bradshaw v. Wyo. DOT Drivers' License Div.*, 2006 WY 70, ¶ 18, 135 P.3d 612, 618 (Wyo.2006).

[¶ 10]  The above-described process is exactly what happened to the appellant. He drove a motor vehicle while under the influence of alcohol, he was arrested, he refused to submit to a chemical test to determine his blood alcohol content, and his driver's license was thereafter suspended.[1] He contended in his administrative hearing and in his petition to the district court, and he now contends on appeal, that B.I.A. officers are not "peace officers" as defined by Wyo. Stat. Ann. § 7–2–101(a)(iv) (LexisNexis 2007), and that, therefore, the two B.I.A. officers had no authority to detain him while waiting for the deputy sheriff to arrive. His conclusion is that his arrest was, therefore, unlawful.[2]

[¶ 11]  It is this contention that became the focus of the agency hearing and of the district court proceedings. Our review, however, guides us to look at two of the precepts within this statutory scheme. First, the scope of the hearing officer's review, as provided by Wyo. Stat. Ann. § 31–6–103(b), and as it relates to this case, is whether the arresting peace officer had probable cause to make the arrest, and second, the request to submit to a chemical test must be made by a peace officer. The point we wish to make is that neither of these precepts is at issue; the arrest was made by a deputy sheriff, who is a peace officer under the statute, and the request for a chemical test was similarly made by a deputy sheriff. What has happened in this case is that the parties have skipped over the actual question presented by the facts: does the detention of the appellant by the B.I.A. officers prior to his arrest make the arrest unlawful as a matter of law?

[¶ 12]  The appellant relies almost solely upon two cases in arguing that his arrest was unlawful. First, he cites *Marshall v. State ex rel. DOT*, 941 P.2d 42, 46 (Wyo.1997), wherein we concluded that college campus police officers "do not have authority to make arrests outside their territorial boundaries absent fresh pursuit." While this is a correct recitation of the holding of the case, it is inapplicable to the issue at hand, because the facts of *Marshall* do not resemble the facts of this case. In *Marshall*, a campus police officer observed what he believed to be a stolen car drive past the campus. The officer left the campus and effectuated a traffic stop that eventually led to an arrest of the car's driver for DWUI. Nothing similar to that happened in the instant case, where neither the B.I.A. officer nor the deputy sheriff left his territorial jurisdiction.

[¶ 13]  The second case relied upon by the appellant is *United States v. Atwell*, 470 F.Supp.2d 554, 560–70 (D.Md.2007), where the court concluded that neither federal nor Maryland state law authorized a military police officer to pursue a traffic law violator from the military base and arrest him off the military base, and further concluded that Maryland's "citizen's arrest" statute did not justify the arrest. Like Marshall, *Atwell* is not applicable to our case, which involved neither fresh pursuit out of an officer's territorial jurisdiction, nor a citizen's arrest.

[¶ 14]  Like the appellant, the State relies primarily upon two cases to support its thesis that the B.I.A. officer was a "peace officer" within the meaning of Wyo. Stat. Ann. § 7–2–101(a)(iv), and was, therefore, qualified to detain the appellant under Wyo. Stat. Ann.

---

1.  A preliminary breath test such as the "alcosensor" test given the appellant at the scene, is not considered to be the chemical test contemplated under the implied consent statute. *Nellis v. Wyo. DOT*, 932 P.2d 741, 745 (Wyo.1997).

2.  In addition to the factors that the State must prove under Wyo. Stat. Ann. § 31–6–103 set forth above (*see supra* ¶ 9), Wyo. Stat. Ann. § 31–6–102(a)(i)(A) (LexisNexis 2007) specifies that the implied consent law applies only in the event of a "lawful arrest." *Marshall*, 941 P.2d at 44; *State v. Chastain*, 594 P.2d 458, 462 (Wyo.1979), *overruled in part on other grounds by Olson v. State*, 698 P.2d 107 (Wyo.1985).

§§ 31–6–101(a)(iv) and 31–6–102(a)(i)(A). In *Pogue v. Allison,* 851 F.Supp. 1536 (D.Wyo. 1994), Pogue was arrested by a B.I.A. officer on the Wind River Indian Reservation and charged under tribal law with DWUI. As part of the arrest, the B.I.A. officer seized Pogue's Wyoming driver's license. *Id.* at 1537. The relevant issue in *Pogue* was whether the B.I.A. officer had the authority to seize the driver's license. In answering that question in the affirmative, the federal district court went through the following exercise in statutory construction:

1. Wyo. Stat. Ann. § 31–7–116 (Lexis-Nexis 2007) requires every driver to display his or her driver's license upon demand to "any police officer as defined in W.S. 31–5–102(a)(xxxiii) [ (LexisNexis 2007) ]."

2. Wyo. Stat. Ann. § 31–5–102(a)(xxxii) defines "police officer" to mean "every officer authorized to direct or regulate traffic or to make arrests for violations of traffic regulations."

3. B.I.A. officers are authorized to make arrests for violation of traffic regulations under tribal law, and are, therefore, "police officers" under the statute.

4. A person arrested for DWUI under Wyo. Stat. Ann. § 31–5–233 (LexisNexis 2007), or similar law including tribal law, must surrender his or her driver's license to the arresting officer, pursuant to Wyo. Stat. Ann. § 31–5–1205(k) (LexisNexis 2007).

*Id.* at 1539–40.

[¶ 15] These statutes led the federal district court to conclude that, inasmuch as B.I.A. agents are authorized to enforce Wyoming's license suspension scheme, "it would be disingenuous to suggest" that they could not "act to effectuate license suspensions." *Id.* at 1540. The limited legal conclusion of *Pogue* is that B.I.A. officers may seize a Wyoming driver's license when enforcing a tribal code DWUI law. *Id.* Unfortunately, *Pogue* does not address either the question of whether a B.I.A. officer is a peace officer under Wyo. Stat. Ann. § 7–2–101(a)(iv), or whether a B.I.A. officer may detain a non-tribal member on the reservation pending arrival of state officers.

[¶ 16] The second case relied upon by the State comes closer, perhaps, to answering the questions pertinent to our inquiry. In *United States v. Santiago,* 846 F.Supp. 1486 (D.Wyo.1994), an airman was arrested for DWUI on Warren Air Force Base near Cheyenne. Wyoming's DWUI laws had been adopted as federal law on the base pursuant to 18 U.S.C. § 13 (1988). *See Santiago,* 846 F.Supp. at 1488 n. 1. After his arrest, Santiago submitted to a breathalyzer test, but later moved to suppress it as evidence on the ground that, *inter alia,* the entry gate guard who arrested him and administered the test was not a "peace officer" as required by Wyo. Stat. Ann. § 31–6–102(a)(i)(C), and as defined by Wyo. Stat. Ann. § 7–2–101(a)(iv). *Id.* at 1495.

[¶ 17] Upon first reading, it appears that *Santiago* stands simply for the proposition that the military guard must be considered a "peace officer" under the statutes for no other reason than to avoid an "odd result." *Id.* In other words, if the military guard could not test Santiago's blood alcohol content, nobody could, and that would be absurd. *Id.* at 1496. A more careful reading, however, reveals that the *ratio decidendi* of the decision is that Wyoming's DWUI law "lacks any authority *of its own force*" on the air base, and must, as a result be interpreted within the context of a law adopted as federal law for use on the base. *Id.* at 1495. In other words, the federal law enforcement officer is a "peace officer" under the statute, not for purposes of Wyoming's own use of the law, but for purposes of federal use of the law. *Id.*

[¶ 18] It makes sense at this juncture to recite the precise points of law upon which the hearing examiner concluded that the B.I.A. officer's detention of the appellant was not unlawful:

51. This Office finds that [the] BIA Officer [ ] had jurisdiction to stop the vehicle and once he determined that the Licensee was not Native American had the authority to detain him until the Fremont County Sheriff's Deputy arrived to take custody. WYO. STAT. ANN. § 7–2–106(a)(i) and (ii) (LEXIS 2006) provides

that an officer can act outside of his jurisdiction upon a request for assistance by an officer within or having jurisdiction or when the peace officer possesses reasonable cause to believe that a crime is occurring involving an immediate threat of serious bodily injury or death to any person.

52. [The] BIA Officer [ ] did not have jurisdiction over the Licensee because he was not an enrolled member of on [sic] the Indian tribes but, jurisdiction for the detention of Licensee was conferred on him by [the deputy sheriffs] while in route [sic] to the scene and by the fact that [the] BIA Officer [ ] had ample reasonable cause to believe that a crime (DWUI) was occurring and such crimes most certainly involved an immediate threat of serious bodily injury or death.

[¶ 19] We are not comfortable with this legal analysis, for several reasons. First, the "peace officer" to which reference is made in Wyo. Stat. Ann. § 7–2–106 is the "peace officer" defined in Wyo. Stat. Ann. § 7–2–101, which definition does not, on its face, include B.I.A. officers or tribal police officers. Second, this incident does not involve extraterritorial authority, because neither the B.I.A. officer nor the deputy sheriff left his respective territorial jurisdiction. Third, the reasoning of *Santiago* does not apply because the facts are so dissimilar. In *Santiago*, Wyoming's DWUI statute had been incorporated into federal law for use on the military base, but only federal law enforcement officers had jurisdiction to enforce it thereon, including application of the chemical testing requirements. Here, the deputy sheriff had the authority to enforce, and did enforce, the DWUI and implied consent statutes because the appellant was not a tribal member. This was not a case where a B.I.A. officer or a tribal police officer was the only officer authorized to enforce the statute. Fourth, there is nothing in the record, or cited law, to suggest that the deputy sheriff somehow conferred upon the B.I.A. officer "jurisdiction for the detention of" the appellant.

[¶ 20] This is not a new or unique question. For years, courts across the country have been faced with jurisdictional issues on Indian reservations and federal enclaves. We will review some of that precedent to demonstrate how similar matters have been resolved. For instance, *Ortiz–Barraza v. United States,* 512 F.2d 1176, 1179 (9th Cir. 1975) held that tribal authorities, as part of their inherent sovereignty, may deliver non-Indian state or federal law violators to the appropriate authorities. Three years later, in *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 208, 98 S.Ct. 1011, 1020, 55 L.Ed.2d 209 (1978), the United States Supreme Court detailed the history of the congressional presumption that Indian tribes did not have criminal jurisdiction over non-Indians on reservations, and then stated that the tribes "are to promptly deliver up any non-Indian offender, rather than try and punish him themselves."

[¶ 21] In 1990, the United States Supreme Court relied upon *Oliphant* and a later case, *United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978), to make more clear the rule stated in *Oliphant.* The correct rule is "that Indian tribes lack jurisdiction over persons who are not tribal members," which includes members of other tribes and not just non-Indians. *Duro v. Reina,* 495 U.S. 676, 685, 110 S.Ct. 2053, 2059, 109 L.Ed.2d 693 (1990).[3] The particu-

---

**3.** A footnote in *Duro* describing jurisdiction on Indian reservations is helpful as general background information in this discussion:

> Jurisdiction in "Indian country," which is defined in 18 U.S.C. § 1151, see *United States v. John,* 437 U.S. 634, 648–649, 98 S.Ct. 2541, 2548–2549, 57 L.Ed.2d 489 (1978), is governed by a complex patchwork of federal, state, and tribal law. For enumerated major felonies, such as murder, rape, assault, and robbery, federal jurisdiction over crimes committed by an Indian is provided by 18 U.S.C. § 1153, commonly known as the Indian Major Crimes Act. . . .

> . . . .

> It remains an open question whether jurisdiction under § 1153 over crimes committed by Indian tribe members is exclusive of tribal jurisdiction. See *United States v. Wheeler,* 435 U.S. 313, 325, n. 22, 98 S.Ct. 1079, 1087, n. 22, 55 L.Ed.2d 303 (1978).

> Another federal statute, the Indian Country Crimes Act, 18 U.S.C. § 1152, applies the general laws of the United States to crimes committed in Indian country:

> . . . .

lar relevance of *Duro* to the instant inquiry is its reiteration of the following rule:

> Tribal law enforcement authorities have the power to restrain those who disturb public order on the reservation, and if necessary, to eject them. Where jurisdiction to try and punish an offender rests outside the tribe, tribal officers may exercise their power to detain the offender and transport him to the proper authorities.

*Id.*, 495 U.S. at 697, 110 S.Ct. at 2065.

[¶ 22] We will mention two additional, more recent, federal cases. In *United States v. Terry*, 400 F.3d 575, 579 (8th Cir.2005), the court relied upon *Duro, Oliphant*, and *Ortiz–Barraza* in holding that tribal police officers on the Pine Ridge Indian Reservation in South Dakota had the authority to detain a non-Indian "whose conduct disturbs the public order on their reservation." Mr. Terry, whose crime was unlawful possession of a firearm, was held in the tribal jail overnight because the county sheriff was 80 miles away, on a rainy night, and there was no deputy sheriff available. *Id.* at 580. A few months after it was published, a federal district court relied upon *Terry* and the cases cited therein to find lawful the detention of a non-Indian on the Turtle Mountain Indian Reservation in North Dakota during the initial stages of an investigation by B.I.A. officers into possible drug offenses. *United States v. Keys*, 390 F.Supp.2d 875, 884 (D.N.D.2005).[4]

[¶ 23] Several state courts have also addressed these issues. In *State v. Assman*, 386 N.W.2d 492, 494 (S.D.1986), the South Dakota Supreme Court reversed Assman's DWUI conviction because Assman, a non-Indian, had been arrested and subjected to the implied consent statute procedures by a B.I.A. officer on the Rosebud Reservation. The reversal was based upon the court's conclusion that the B.I.A. officer was not a "law enforcement officer" under applicable South Dakota law. *Id.* This fact situation is not similar to ours, where the arrest was made by, and the implied consent advisements were given by, the deputy sheriff.

[¶ 24] To the contrary, the facts in *State v. Schmuck*, 121 Wash.2d 373, 850 P.2d 1332 (1993), are quite similar to ours. Schmuck, a non-Indian, was stopped for speeding by a tribal police officer on the Port Madison Reservation. *Id.* at 1333–34. Circumstances indicated that Schmuck was intoxicated, so he was detained pending the arrival of a Washington state patrolman. *Id.* at 1334. The patrolman arrested Schmuck and transported him to a county jail, where he submitted to a chemical test to determine his blood alcohol content. *Id.* Schmuck appealed his conviction on the ground that the Suquamish Tribe had no authority to stop and detain a non-Indian on the reservation. *Id.* at 1335. Relying upon *Oliphant, Wheeler, Duro, Ortiz–Barraza*, and other cases with similar holdings, the Supreme Court of Washington rejected Schmuck's contentions and concluded that the tribe retained the right to stop non-Indian violators and to detain them for delivery to state authorities for prosecution. *Id.* at 1342. *See also State v. Pamperien*, 156 Or.App. 153, 967 P.2d 503, 504–06 (1998); and *State v. Haskins*, 269 Mont. 202, 887 P.2d 1189, 1195 (1994).

[¶ 25] Viewing the facts of the instant case in the context of the law just recited, we must conclude that nothing occurred in the detention of the appellant to render his arrest unlawful. The appellant could not have been arrested and prosecuted within the tribal court system because he was not a tribal member. He could not have been arrested by the B.I.A. officer and prosecuted within the federal system because the DWUI of-

---

The general law of the United States may assimilate state law in the absence of an applicable federal statute. 18 U.S.C. § 13 . . . .

For Indian country crimes involving only non-Indians, longstanding precedents of this Court hold that state courts have exclusive jurisdiction despite the terms of § 1152 . . . .

The final source of criminal jurisdiction in Indian country is the retained sovereignty of the tribes themselves. It is undisputed that the tribes retain jurisdiction over their members,

subject to the question of exclusive jurisdiction under § 1153 mentioned above . . . .

*Id.*, 495 U.S. at 680 n. 1, 110 S.Ct. at 2057 n. 1.

4. Keys filed several motions to suppress evidence, one of which was granted because the court found that Keys' detention for several days eventually became unreasonable. *Keys*, 390 F.Supp.2d at 884.

fense was a State offense, making him subject to arrest and prosecution by the State. Despite the jurisdictional olio on the reservation, the law is clear that the appropriate action to be taken in circumstances such as those presented in this case is for the reservation officer to detain the appellant for formal arrest by a state officer.[5] That is what happened.

### CONCLUSION

[¶ 26] The appellant was lawfully detained by the B.I.A. officer pending his lawful arrest by the deputy sheriff. The State proved by a preponderance of the evidence the statutory elements required for the suspension of the appellant's driver's license due to his refusal to submit to a chemical test of his blood alcohol content. The Order Upholding Implied Consent Suspension is affirmed.

---

**5.** If there is a distinction to be made between a tribal police officer and a B.I.A. officer in these cases, such has not been raised by the parties, and no argument has been presented that it is a distinction with a difference. There may be room to argue that the inherent authority of an Indian tribe on a reservation cannot be exercised through B.I.A. agents. We are not inclined to explore that issue on our own, where it has not been raised by the parties, and where the underlying policy of maintaining law and order on the reservation is satisfied by the action of either officer.