**UNITED STATES of America, Plaintiff–Appellee,**

v.

**David R. HAWKINS, Defendant–Appellant.**

**No. 00–10149.**

United States Court of Appeals, Ninth Circuit.

Submitted Feb. 16, 2001*

Filed May 7, 2001

---

* The panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R.App. P. 34(a)(2).

Daniel J. Broderick, Assistant Federal Defender, and Richard A. Cohen, Sacramento, California, for the defendant-appellant.

Kenneth J. Melikian, Assistant United States Attorney, Sacramento, California, for the plaintiff-appellee.

Before: ALARCON, KOZINSKI, and HAWKINS, Circuit Judges.

ALARCON, Circuit Judge:

David R. Hawkins appeals from the district court's order affirming the magistrate judge's denial of his motion to suppress evidence obtained as the result of the warrantless stop of his truck as he was about to leave McClellan Air Force Base ("McClellan"). He contends that the McClellan military police officers who stopped his truck violated his Fourth Amendment rights because the Government failed to present any evidence of an individualized suspicion of wrongdoing or demonstrate that probable cause existed that he had committed a crime. We affirm because we conclude that the base commander's regulations requiring vehicles entering or leaving McClellan to stop for inspection are a reasonable intrusion upon an individual's right to privacy under the Fourth Amendment.

I

Hawkins submitted his own declaration in support of his motion to suppress alleging that on May 16, 1999, as he was leaving McClellan between 11:30 p.m. and 12:00 a.m., he observed two officers and a police car on the side of the road by the guard booth at the Peacekeeper entry and exit gate to the base. One of the officers shined a light signaling Hawkins to pull his truck over to the side. After Hawkins stopped, an officer approached and asked him for his vehicle registration, proof of insurance, and driver's license. At the request of the officers, Hawkins performed a field sobriety test. The officers informed Hawkins that he would be detained for suspicion of driving under the influence of alcohol. He was then taken to a room where he was given a breath test, and an officer later gave him a violation notice for driving under the influence of alcohol.

Hawkins was charged in a two-count information with driving under the influence of alcohol and driving with a blood alcohol content of .08% or greater, misdemeanor violations of 18 U.S.C. § 13 and California Vehicle Code § 23152(a)-(b). He then filed a motion to suppress the following evidence obtained after the stop: (1) the fact that an officer smelled a strong odor of alcohol emanating from Hawkins; (2) the results of a field sobriety test; (3) statements made by Hawkins; and (4) the results of the breath test that showed that he had a blood alcohol content of .15%.

In opposition to Hawkins's motion to suppress, the Government submitted the declaration of Staff Sergeant Gregory Fowlkes, the noncommissioned officer in charge of reports and analysis for the Seventy–Seventh Security Forces Squadron at McClellan. In his declaration, Sgt. Fowlkes alleged that vehicles entering and leaving McClellan are detained by officers pursuant to regulations issued by the base commander for conducting Installation Entry Point Checks ("IEPC" stops). The purpose of IEPC stops is to ensure national security by restricting access to military installations, to deter theft of government property from the base, and to ensure safety on McClellan roadways, including preventing driving under the influence of alcohol. Military police officers conducting IEPC stops have caught individuals attempting to trespass on the base, driving under the influence, driving on suspended

licenses, and attempting to steal government property.

Sgt. Fowlkes also alleged in his declaration that IEPC stops are cursory, conducted at the entry and exit gates of the base according to established military operating procedures. Signs posted at every entry gate to the base state: "It is unlawful to enter this area without permission of installation commander.... While on this installation, all personnel and the property under their control are subject to search." At the hearing on the motion to suppress, Sgt. Fowlkes testified that the procedures for conducting IEPC stops were set forth in McClellan Operating Instructions 31–16 and 31–17, both of which were in effect on the evening Hawkins was stopped.

In his motion to suppress, Hawkins argued that the arresting officers lacked probable cause to stop his automobile. In its opposition to the motion to suppress, the Government argued as follows:

> The United States hereby opposes defendant's motion on the grounds that (1) Fourth Amendment jurisprudence does not require probable cause for every conceivable search or seizure, (2) the substantial government interest in protecting the security of military bases outweighs the nominal intrusion on the motorists who choose to enter such protected installations, and (3) although the defendant was seized for purposes of the Fourth Amendment, the seizure was not unreasonable and therefore not a violation of the defendant's Fourth Amendment rights.

After a hearing, the magistrate judge denied Hawkins's motion [1] concluding that "the police did not need probable cause to *stop* vehicles at a permanent military gate

checkpoint." (emphasis added). After entering a conditional plea of guilty on November 9, 1999, Hawkins filed a timely notice of appeal from the order denying his motion to suppress to the United States District Court for the Eastern District of California.

On March 20, 2000, the district court affirmed the magistrate judge's decision holding that the seizure of Hawkins's truck was reasonable. Hawkins filed a timely notice of appeal on March 24, 2000. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II

▪ Before this court, Hawkins contends that the Government failed to meet its burden of demonstrating that the stop, search, and seizure of his person and automobile were constitutional because it "failed to supply any facts, by way of affidavit, testimony or otherwise, relating to the circumstances surrounding such stop, search, and seizure." We review de novo the lawfulness of a search or seizure. *United States v. Hudson,* 100 F.3d 1409, 1414 (9th Cir.1996).

▪ In his motion to suppress evidence, Hawkins's sole constitutional challenge was to the alleged "unlawful stop of his vehicle conducted by an officer at McClellan Air Force Base on May 16, 1999." In support of this claim, he argued that "the government cannot establish *probable cause* to stop Mr. Hawkins' automobile." (emphasis added). He did not contend that the officers lacked reasonable suspicion to investigate whether Hawkins was under the influence of alcohol based on the condition of his breath, eyes, and speech.

---

1. A magistrate judge has jurisdiction to preside over misdemeanor prosecutions if "specially designated to exercise such jurisdiction by the district court." 18 U.S.C. § 3401(a).

Eastern District of California Local Criminal Rule 58–421 and Local Magistrate Rule 72–302(b)(3) designate magistrate judges to exercise jurisdiction in misdemeanor cases.

Nor did he assert that the officers lacked probable cause to arrest him based on his performance of the field sobriety test or the breath test for blood alcohol. Before this court, for the first time, Hawkins contests the actions of the Air Force police officers in requiring him to submit to these sobriety tests.

■ The failure to raise a particular ground in support of a motion to suppress constitutes a waiver of that challenge. *United States v. Restrepo–Rua,* 815 F.2d 1327, 1329 (9th Cir.1987). The basis for the rule that issues not presented to the trial court generally cannot be raised for the first time on appeal is that "[i]t would be unfair to surprise litigants on appeal by final decision of an issue on which they had no opportunity to introduce evidence." *United States v. Whitten,* 706 F.2d 1000, 1012 (9th Cir.1983). We have recognized an exception to this rule where the issue not raised in the trial court does not affect or rely on the factual record developed by the parties. *Id.* Here, factual questions concerning the officers' observations and the sobriety test results "might bear decisively on the determination of the legal question whether the Fourth Amendment was violated." *Id.* Since the only issue raised by Hawkins before the magistrate judge concerned the legality of the stop of his truck, the Government was not required to present evidence to justify the investigation and arrest that followed. For these reasons, we decline to consider whether the officers violated the Fourth Amendment by requiring Hawkins to perform sobriety tests and limit our review to determining whether the stop of Hawkins's truck was a reasonable seizure under the Fourth Amendment.

### III

■ Where, as here, a defendant moves to suppress evidence of a warrantless stop of his or her vehicle, the record must demonstrate that the seizure was reasonable. A seizure conducted without a warrant is *"per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson,* 508 U.S. 366, 372, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (internal quotation marks and citations omitted). The burden is on the Government to persuade the district court that a seizure comes "under one of a few specifically established exceptions to the warrant requirement." *United States v. Huguez–Ibarra,* 954 F.2d 546, 551 (9th Cir.1992).

The Government conceded that the stop of Hawkins's truck was a seizure, and that the officers had neither probable cause to arrest Hawkins nor an individualized suspicion of wrongdoing that would justify a brief detention under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). To justify the warrantless stop of Hawkins's truck, the Government introduced evidence that the base commander had ordered that vehicles entering or leaving McClellan be stopped for inspection.

■ "The touchstone of the Fourth Amendment is reasonableness. The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno,* 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) (citations omitted). In *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), the Supreme Court held that:

> The reasonableness of seizures that are less intrusive than a traditional arrest depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." Consider-

ation of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.

*Id.* at 50–51, 99 S.Ct. 2637 (citations omitted). In determining whether a stop conducted at a checkpoint meets this reasonableness test, we have considered the following non-exclusive factors: (1) the primary purpose of the checkpoint; (2) whether all vehicles are stopped; (3) whether the officers exercise discretion over the checkpoint's operation; (4) whether the checkpoint is well identified; and (5) whether the stop involves a minimal intrusion. *United States v. Soto–Camacho,* 58 F.3d 408, 411 (9th Cir.1995);

*United States v. Hernandez,* 739 F.2d 484, 487–88 (9th Cir.1984).

 McClellan's base commander ordered that vehicles be stopped at the base gates to ensure national security, to prevent theft of government property, and to enforce traffic safety regulations. It is beyond dispute that the military has a substantial interest in preventing the theft of its property and in ensuring national security.[2] Moreover, the Supreme Court has upheld checkpoints that are designed to enforce traffic safety regulations. *Mich. Dep't of State Police v. Sitz,* 496 U.S. 444, 451, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (holding that sobriety checkpoints advance a substantial public interest by preventing drunk driving). Accordingly, we conclude that the primary purpose of this checkpoint advanced a substantial public interest.[3]

2. Not only are these interests important in themselves, *see, e.g., Soto–Camacho,* 58 F.3d at 411 (checkpoint operated to detect illegal aliens advances substantial public interest), but courts have long recognized that the Judicial Branch should defer to decisions of the Executive Branch that relate to national security. *See Dep't of the Navy v. Egan,* 484 U.S. 518, 530, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988) (noting that "unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."); *Cafeteria & Rest. Workers Union, Local 473 v. McElroy,* 367 U.S. 886, 893, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) (noting that a post commander has traditionally been able to "exclude private persons and property [from the base], or admit them under such restrictions as he may prescribe in the interest of good order and military discipline.") (citation omitted).

3. The *Sitz* decision has been applied to checkpoint stops on military bases by several district courts in published opinions. In *United States v. Ziegler,* 831 F.Supp. 771 (N.D.Cal. 1993), the court held that a sobriety checkpoint outside the Imjin Road Gate to Fort Ord Army Reserve military base was reasonable under the *Sitz* balancing test. *Id.* at 774–75.

The court rejected the contention that the failure to provide advance publicity or a warning that vehicles will be stopped at a checkpoint is subjectively intrusive. *Id.*

In *United States v. Santiago,* 846 F.Supp. 1486 (D.Wyo.1994), the court held that a random stop of a vehicle at the gate to the Warren Air Force base pursuant to a check for government property, contraband, and classified information was reasonable because of the Government's substantial interest in security at military bases. *Id.* at 1492–1493.

In *United States v. Dillon,* 983 F.Supp. 1037 (D.Kan.1997), the court upheld the random stop of a vehicle at an inspection point at an entrance to the military base at Fort Riley in the state of Kansas. *Id.* at 1038–40. The court held that the fact that "[t]his checkpoint was not only a sobriety checkpoint, but a vehicle inspection, looking for contraband, weapons, and wrongfully appropriated military equipment" demonstrated that these intrusions were "necessary for the safety and welfare of [the base commander's] installation." *Id.* at 1040.

More recently, in *United States v. Ellis,* 15 F.Supp.2d 1025 (D.Colo.1998), the court held that the stop of all vehicles at a checkpoint inside the entrance to Fort Carson in the state of Colorado was reasonable. The court con-

The record is unclear as to whether the officers were under orders to stop every vehicle attempting to exit from the Peacekeeper gate on the night in question, but the Government offered uncontested evidence that the officers had no discretion over the checkpoint's operation. We believe that, under the totality of circumstances presented in this case, the Government was not required to prove that the officers were under orders to stop every vehicle in the absence of any indication that they exercised unreasonable discretion in operating the checkpoint.[4] *See United States v. Martinez–Fuerte*, 428 U.S. 543, 559, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (noting that at a fixed checkpoint "there is less room for abusive or harassing stops of individuals," but that judicial review is available for claims that officers exercised unreasonable discretion in operating the checkpoint).

The Supreme Court has recognized that the final two factors in our analysis are intertwined because at well-marked checkpoints, a "motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion." *Id.* at 558, 96 S.Ct. 3074 (quoting *United States v. Ortiz*, 422 U.S. 891, 895, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975)). In weighing whether a seizure at a fixed checkpoint is unduly intrusive, we consider both the objective and subjective impact of the governmental intrusion. *Sitz*, 496 U.S. at 452, 110 S.Ct. 2481. An objective intrusion is "measured by the duration of the [stop] and the intensity of the investigation." *Id.*

A subjective intrusion is measured by "the fear and surprise engendered in law-abiding motorists by the nature of the stop." *Id.*

The record shows that the officers detained Hawkins briefly while they asked him to produce his driver's license, the registration of his vehicle, and proof that it was insured. The officers' observations during this initial detention preceded the request that Hawkins perform a field sobriety test. Hawkins does not contend, nor does the record demonstrate, that he was subjected to a prolonged detention or an intrusive investigation prior to the time the officers smelled his breath. We are therefore persuaded that the initial stop was not objectively intrusive.

The stop was not subjectively intrusive. The checkpoint was fixed at an entry and exit gate to McClellan and the officers assigned to the checkpoint were required to wear identifying uniforms. A sign at the gate warned that "[w]hile on this installation, all personnel and the property under their control are subject to search." This sign, the fixed location of the checkpoint, and the fact that uniformed officers conducted the stop greatly reduced the possibility that a law-abiding motorist would be "frightened or annoyed by the intrusion." *Sitz*, 496 U.S. at 453, 110 S.Ct. 2481 (internal quotation marks omitted). The subjective intrusion resulting from this stop was therefore indistinguishable from that of other checkpoint stops that have been found to be reasonable under the Fourth Amendment. *See, e.g., Sitz*, 496 U.S. at 453, 110 S.Ct. 2481 (holding

---

cluded that "[d]eference must be granted to military commanders to allow them to maintain security on a base, even if that base is open." *Id.* at 1030.

4. In some instances, the failure to stop every vehicle at a checkpoint could raise concerns

over the subjective intrusiveness of the checkpoint. There is no indication in the record, however, that Hawkins was treated differently from other drivers on the night in question or that a law-abiding motorist would have been unduly surprised or afraid because of this stop.

that brief stop at sobriety checkpoint conducted by uniformed police officers pursuant to guidelines did not constitute an unreasonable seizure under the Fourth Amendment); *Martinez–Fuerte*, 428 U.S. at 566, 96 S.Ct. 3074 (holding that "stops for brief questioning routinely conducted at permanent checkpoints are consistent with the Fourth Amendment and need not be authorized by warrant.").

The Government's interest in maintaining national security and promoting public safety on base roadways outweighed the brief and limited intrusion resulting from stopping Hawkins at the Peacekeeper gate. We hold, therefore, that the stop of Hawkins and his truck was reasonable under the Fourth Amendment.

## IV

■ Hawkins also contends that the denial of his motion to suppress must be reversed because the Government failed to offer the testimony of the officers who stopped his vehicle. He argues that, as a result, there is no evidence in the record that the officers who stopped his truck correctly followed the procedures set forth in Operating Instructions 31–16 and 31–17 or the specific checkpoint guidelines issued by the base commander for May 16, 1999. We disagree. Hawkins has failed to raise a specific "claim that a particular exercise of discretion in locating or operating [the] checkpoint" was unreasonable. *Martinez–Fuerte*, 428 U.S. at 559, 96 S.Ct. 3074.

Moreover, Hawkins's assertion that no evidence was presented "as to the facts surrounding the stop of [his] car" is patently incorrect. Hawkins's own declaration stated that he was stopped between 11:30 p.m. and 12:00 a.m. as he was leaving McClellan by two officers who requested that he display his registration, proof of insurance, and driver's license. Additionally, the Government offered uncontested

evidence that Operating Instructions 31–16 and 31–17 were in effect on the evening Hawkins was stopped. Operating Instruction 31–16 expressly provides that between "2200—0500" a " 'HANDS ON' check of ID credentials will be conducted at all posted base entry gates." (emphasis in original). Operating Instruction 31–17 sets forth procedures for stopping vehicles entering or exiting McClellan and provides that the installation commander or designee shall designate the "time, place, duration and method of selecting vehicles to be stopped and inspected."

■ The Government is not required to demonstrate that an officer conducting a reasonable seizure did not err in carrying out his or her duties. In *Illinois v. Rodriguez*, 497 U.S. 177, 185–86, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), the Supreme Court stated this principle:

It is apparent that in order to satisfy the "reasonableness" requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government—whether the magistrate issuing a warrant, the police officer executing a warrant, or the police officer conducting a search or seizure under one of the exceptions to the warrant requirement—is not that they always be correct, but that they always be reasonable. As we put it in *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949): "Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability."

876

(citations omitted). There is no evidence in the record that the officers conducted themselves unreasonably in stopping Hawkins's truck.

**AFFIRMED.**