REVISED JUNE 14, 2002

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 01-50536

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EMMA LUCILLE GREEN

Defendant-Appellant.

_____

Appeal from the United States District Court
For the Western District of Texas

_____

June 11, 2002

Before KING, Chief Judge, HIGGINBOTHAM and EMILIO M. GARZA, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Emma Lucille Green was stopped at a roadblock checkpoint on Fort Sam Houston in San Antonio and found to be without license or proof of insurance. She attempted to flee and military police arrested her and impounded the car. Crack cocaine was found during an inventory search of the car resulting in a charge of possession with intent to distribute crack cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii). Green entered a conditional plea

of guilty and now appeals the district court's denial of her motion to suppress the evidence found in her vehicle, alleging it is the fruit of an unreasonable search in violation of the Fourth Amendment.

I

In the late evening hours of February 11, 2000 and until the early morning of February 12, 2000, at Fort Sam Houston in San Antonio, Texas, military police operated a "Force Protection Vehicle Checkpoint." At this particular checkpoint, which was administered in accordance with a standard operating procedure, every sixth car traveling north on New Braunfels Avenue would be stopped at its intersection with Hood Street and directed into an adjacent parking lot. The checkpoint was marked by signs, cones, and flares, and the military police operating the checkpoint were in uniform.

Emma Lucille Green's car was stopped as a sixth vehicle at the checkpoint. Operating at all times in accordance with the standard operating procedure, military police asked her for her driver's license and proof of insurance. Green's inability to produce either of these documents violated Texas law. The officers then ran a criminal background check and license plate check on the car, discovering that Green had no driver's license and the car was not hers. At this point the officers asked her to exit the car. Green refused and attempted to flee. She was apprehended and arrested. The car was impounded and, in a standard inventory search, officers

2

found the nine rocks of crack cocaine on the front seat in a plastic bag.

Green moved to suppress the drug evidence as the fruit of an unreasonable seizure in violation of the Fourth Amendment. Finding that the checkpoint served national security purposes and was reasonable, the district court denied her motion to suppress. Green then pled guilty to the offense, reserving her right to appeal. She was sentenced to 24 months of imprisonment followed by a four-year term of supervised relief.

II

In an appeal from the denial of a motion to suppress, we review questions of law *de novo* and factual findings of the district court for clear error.[1]

A

We first make it plain that after determining the validity of the programmatic purpose, the scope of our inquiry extends to only what occurred when Green was stopped. It does not, despite Green's urging, extend to an abstract consideration of the scope of *searches* of other vehicles.[2] With a valid programmatic purpose,[3]

---

[1] *United States v. Valadez*, 267 F.3d 395, 397 (5th Cir. 2001).

[2] The standard operating procedure included, after presentation of license, proof of insurance, and registration, informing the driver that they had impliedly consented to a search, and proceeding to inspect the interior of the vehicle, including any locked compartments or packages, the engine, and trunk areas. If a particular area could not be searched, or if the driver refused to cooperate, they were to be escorted off the base by military police. Gov't Ex. 1.

[3] *United States v. Machuca-Barrera*, 261 F.3d 425, 433 (5th Cir. 2001).

3

the stop of Green's vehicle was lawful, and it was not searched in a relevant sense[4] until after the military police had probable cause to arrest her and impound her vehicle. It was then subjected an inventory search and the drugs were discovered.[5]

B

A checkpoint-type stop of an automobile is a seizure constrained by the Fourth Amendment.[6] A suspicionless seizure is ordinarily unreasonable and therefore a violation of the Fourth Amendment.[7] The Supreme Court has upheld suspicionless stops of vehicles at immigration[8] and sobriety[9] checkpoints, and suggested that, while roving patrols do not pass muster, discretionless stops

---

[4] The record indicates that before she was arrested, one officer possibly looked under the hood of Green's car. Assuming *arguendo* that this search was unconstitutional, however, it did not lead to the discovery of the crack cocaine on the front seat of Green's car, and therefore cannot require the exclusion of that evidence. Green does not rely on this search to make her case, in any event.

[5] Warrantless inventory searches of seized automobiles do not violate the Fourth Amendment if they are conducted "pursuant to standardized regulations and procedures that are consistent with (1) protecting the property of the vehicle's owner, (2) protecting the police against claims or disputes over lost or stolen property, and (3) protecting the police from danger." *United States v. Lage*, 183 F.3d 374, 380 (5th Cir. 1999). Green does not argue that the inventory search violated the Fourth Amendment, but rather that the checkpoint seizure was unreasonable and the evidence obtained in the inventory search must be excluded as the fruit of an unlawful seizure.

[6] *Delaware v. Prouse*, 440 U.S. 648, 653 (1979).

[7] *Chandler v. Miller*, 520 U.S. 305, 308 (1997).

[8] *United States v. Martinez-Fuerte*, 428 U.S. 543, 566 (1976).

[9] *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 455 (1990).

4

designed to check a driver's license and registration are permissible.[10]

While it initially rejected such an approach,[11] the Supreme Court recently held, in *City of Indianapolis v. Edmond*[12] that a narcotics checkpoint violated the Fourth Amendment because its "primary purpose" was indistinguishable from the "general interest in crime control."[13] "Consistent with this suggestion, each of the checkpoint programs that we have approved was designed primarily to serve purposes closely related to the problems of policing the border or the necessity of ensuring roadway safety."[14] To be valid a checkpoint, then, must reach beyond general crime control—either targeting a special problem such as border security or a problem peculiar to the dangers presented by vehicles.

Green argues that the purpose of this checkpoint was merely to make individuals on the base aware of security procedures. Green relies on a memorandum establishing the checkpoints, which states, in part:

> The checks will be conducted to reinforce installation security awareness and to emphasize to personnel, having

---

[10] *Prouse*, 440 U.S. at 663.

[11] *See Sitz*, 496 U.S. 449, 450 (rejecting "special needs" approach to roadblocks that would focus on the purpose of the seizure).

[12] 531 U.S. 32, 48 (2000).

[13] *Id.*

[14] *Id.* at 41.

5

access to the installation, the security posture which is being maintained.[15]

However, this same memorandum also incorporates the Standard Operating Procedure for the Installation Force Protection Vehicle Checkpoints, which clearly states its goals:

1. protect national security by deterring domestic and foreign acts of terrorism;
2. maintain readiness and effectiveness;
3. deter the entrance of persons carrying explosives;
4. protect federal property; and
5. ensure the safety of the soldiers, civilian employees, retirees and family members on the installation.[16]

The parties appear to dispute what our standard of review should be with respect to the primary purpose of the checkpoint. Green argues that *de novo* review should apply, relying on the Supreme Court's review of the purpose of a drug-testing regime in its recent decision in *Ferguson v. City of Charleston*.[17] The Government argues that the purpose of a checkpoint is a factual finding that should be reviewed for clear error.

We first note that *Ferguson*, while it cites to *Edmond*, is a case involving the "special needs" doctrine in regards to *searches*, not roadblock *seizures*. The Court, in fact, distinguished *Ferguson* on these grounds, stating that "[t]his case also differs from the

---

[15] Gov't Ex. 2.

[16] Gov't Ex. 1.

[17] 532 U.S. 67, 81 (2001) ("In looking to the programmatic purpose, we consider all the available evidence in order to determine the relevant primary purpose." (citing *Edmond*, 531 U.S. at 46-47)).

6

handful of seizure cases in which we have applied a balancing test to determine Fourth Amendment reasonableness."[18] The extent to which the inquiry into purpose demanded by *Edmond* and the "special needs" doctrine is the same is still an open question. In any event, the Court did not clearly state that in either case was the question one of mixed fact and law which would require *de novo* review.

We agree with the D.C. Circuit that the primary purpose of a checkpoint is a finding of fact reviewed for clear error.[19] We conclude that the district court did not clearly err in its finding that "[t]his was a legal checkpoint set up by the military installation to inspect vehicles and make sure they had valid license, registration, proof of insurance, security at the military installation."

C

Given a purpose of ensuring the security as well as traffic safety at the installation we must, however, ask whether this purpose is distinct from the general interest in crime control. If not, then the teaching of *Edmond* is that the checkpoint system at issue violates the Fourth Amendment. We believe that this case differs substantially from *Edmond* in two respects. First, the protection of the nation's military installations from acts of

---

[18] *Id.* at 83 n.21; *see also Edmond*, 531 U.S. at 54 (Rehnquist, C.J., dissenting).

[19] *United States v. Davis*, 270 F.3d 977, 980 (D.C. Cir. 2001).

7

domestic or international terrorism is a unique endeavor, akin to the policing of our borders, and one in which a greater degree of intrusiveness may be allowed.[20] Second, those cases focusing not on unique, national challenges, but instead on road safety,[21] are concerned with dangers specifically associated with vehicles and therefore justify suspicionless checkpoint seizures. Since we know from painful experience that vehicles are often used by terrorists to transport and deliver explosives in the form of "car bombs," and that military installations have historically faced greater risk than civilian communities of such a bombing, vehicles pose a special risk.

We conclude that the purpose of this suspicionless checkpoint stop was not the "general interest in crime control." Rather its more narrow purpose was to the protect a military post, distinct from a general law enforcement mission. We must then proceed to the balancing of interests that the Court requires in order to determine whether this stop was valid under the Fourth Amendment.

III

"Roadblock seizures are consistent with the Fourth Amendment if they are 'carried out pursuant to a plan embodying explicit,

---

[20] *See United States v. Hawkins*, 249 F.3d 867, 873 (9th Cir. 2001) ("It is beyond dispute that the military has a substantial interest in ... ensuring national security."); *see also id.* at 873 n.2 (comparing protection of national security at military installation to interest in preventing illegal immigration).

[21] *See Edmond*, 531 U.S. at 39-40 (stating that previous cases upholding checkpoints or implying their validity had focused on highway safety) (citing *Sitz*, 496 U.S. at 447-48; *Prouse*, 440 U.S. at 661).

neutral limitations on the conduct of individual officers.'"[22] The Court's decisions require us to balance the objective and subjective intrusion on the individual against the Government interest and the extent to which the program can reasonably be said to advance that interest.[23]

The degree of objective intrusion is "measured by the duration of the seizure and the intensity of the investigation."[24] In this case the objective intrusion was virtually identical to that upheld in *Michigan Department of State Police v. Sitz*[25] and *United States v. Martinez-Fuerte*.[26] Green's car was stopped and she was directed to pull into an adjacent parking lot. She was asked for her license and proof of insurance and was unable to produce either. The total duration of the stop before probable cause to arrest Green arose was considerably less than the three to five minutes that the Court found minimal in *Martinez-Fuerte*.[27] The seizure of

---

[22] *Edmond*, 531 U.S. at 49 (Rehnquist, C.J., dissenting) (quoting *Brown v. Texas*, 443 U.S. 47, 51 (1979)).

[23] *See, e.g., Sitz*, 496 U.S. at 455. We note again that only the stop is under consideration here. As the Court in *Sitz* carefully noted that there was no allegation in *Sitz* of "unreasonable treatment of any person after an actual detention at a particular checkpoint." *Id.* at 450. Consequentially, when looking at the checkpoint we look at only its *seizure* component, the actual stop, not the *search* that the memorandum indicates should then follow. *See* Part II.A.

[24] *Sitz*, 496 U.S. at 452.

[25] 496 U.S. 444, 455 (1990).

[26] 428 U.S. 543, 566 (1976).

[27] *Id.* at 546-47.

Green was only minimally intrusive under the objective prong of this test.

As to subjective intrusion, the touchstone is the "potential for generating fear and surprise."[28] Everyone entering Fort Sam Houston was warned with signs about the possibility of searches. At the checkpoint, there were signs, cones, and flares. While Green attempts to characterize the sight of soldiers as frightening, uniformed military police on the grounds of a military installation that has been clearly identified to drivers should not be frightening to "law-abiding motorists."[29] That the checkpoint stopped every sixth vehicle, rather than every single vehicle, counters any suggestion of subjective intrusion because it might dispel any concern of a law-abiding motorist that she had been singled out. There is no evidence that Green was singled out or treated arbitrarily or that the officers were operating with unfettered discretion as to which cars to stop.

The level of intrusiveness must be balanced against the government interest in the checkpoint and the reasonable effectiveness of the approach. We have already stated that there is a strong governmental interest in the protection of our military materiel and personnel. The military has as much right to protect

[28] *Sitz* at 452.

[29] *Id.*

10

those on roads traversing its enclave as a State has to protect those on its highways.[30]

Green argues that this interest differs between closed and open military installations and that since Fort Sam Houston was, at the time of Green's arrest, an open installation, its military mission and unique attractiveness for violent strikes cannot suffice to justify a suspicionless stop. Green advances two arguments in support of this position. First she cites *Flower v. United States*,[31] where the Supreme Court held that a sidewalk leafleteer could not be excluded from Fort Sam Houston's public streets, for the proposition that the government has abandoned any special national security interest in an open military base. Of course it is settled that "[t]he base commandant can no more order petitioner off this public street .. than could the city police order any leafleteer off any public street,"[32] but nothing in *Flower* or reality suggests that opening a military base to the public to

---

[30] *See id.* at 873 & n.3 (stating that "[i]t is beyond dispute that the military has a substantial interest ... in ensuring national security" and citing cases); *see also Greer v. Spock*, 428 U.S. 828, 837 (1976) ("One of the very purposes for which the Constitution was ordained and established was to 'provide for the common defence,' and this Court over the years has on countless occasions recognized the special constitutional function of the military in our national life, a function both explicit and indispensable." (quoting U.S. Const., Preamble)).

[31] 407 U.S. 197 (1972).

[32] *Id*. at 198 (stating that the military, when it opened the street to the public, "abandoned any claim that it has special interests in who walks, talks, or distributes leaflets on the avenue" but not addressing whether the military abandoned any special interest (beyond those state authorities would possess) in who carries weapons of mass destruction onto the base).

11

such an extent deprives the government of the right to respond to distinct risks faced at a military installation. Green appears to be urging that we declare Fort Sam Houston, on the authority of *Flower*, some sort of "free zone" where the Fourth Amendment balancing of interests must be identical to that performed for police action on any public street in America—in other words we must turn a blind eye to the presence of the United States military at the installation. This notion lacks textual or jurisprudential support, and we reject the invitation to search for such a connection in the interstices between the First and Fourth Amendments. To the contrary, the military's concern for the security of its facility and its creation of a public forum are not inconsistent—conceptually or programatically. These two can be complementary in choosing between excluding the public and practical precaution necessary to secure a military facility.

The conduct of the military police in this case reaches no farther than those state license checkpoints that have passed constitutional muster in a number of circuits.[33] We also recognize the additional reasons the military may wish to conduct such suspicionless stops as weighing even more strongly in favor of the

---

[33] *Davis*, 270 F.3d at 980; *United States v. Brugal*, 209 F.3d 353, 357 (4th Cir. 2000); *United States v. Galindo-Gonzales*, 142 F.3d 1217, 1222 (10th Cir. 1998); *United States v. Trevino*, 60 F.3d 333, 335-36 (7th Cir. 1995); *Merrett v. Moore*, 58 F.3d 1547, 1551 & n.3 (11th Cir. 1995). We leave for another day the question of whether license and registration checkpoints on state highways are constitutional, because of the additional national security interest present in this case.

12

reasonableness of the search. Consequently, while we might agree that on an open military base the range of law enforcement activity that does not violate the Fourth Amendment is narrowed as compared to a closed base,[34] that does not mean that the security of the installation and its personnel are not a substantial government interest.[35]

Green maintains that there is a constitutional difference between entry points to a military installation and points interior to that installation in terms of the types of warrantless seizures that will be considered reasonable. In support of this contention, she cites to several cases finding checkpoint searches at entry points constitutional, but overlooks opposing authority for a checkpoint internal to an open base.[36] We see no dispositive distinction here.[37]

---

[34] *See, e.g., United States v. Ellis*, 547 F.2d 863, 866-67 (5th Cir. 1977) (holding that consent to search automobile without probable cause was validly obtained where commander of closed military base made it a condition of obtaining a visitor's pass to enter the installation).

[35] Green's cited cases are inapposite. For example, she cites to *United States v. Ellis*, 15 F. Supp.2d 1025 (D. Colo. 1998), for the proposition that there is a legal difference between open and closed military bases. In *Ellis*, the district court upheld a checkpoint stop of a car within an open military installation, Fort Carson, that resulted in a narcotics arrest. Green asserts in her brief to this court that Fort Carson was a closed base, despite the court's clear statement to the contrary. *Compare* Appellant's Brief at 19 *with Ellis*, 15 F. Supp.2d at 1029 ("The situation before this Court involves a military base that *was not closed* ....") (emphasis added).

[36] *Id.*

[37] Green also points to a regulatory provision that seems to suggest that the seizure of her vehicle was not authorized. *See* 32 C.F.R. § 634.7(a)(3) ("Stops and inspections of POVs within the military installation, other than at restricted areas or at an installation gate, are authorized only when there is a reasonable basis to believe that the stop/inspection is necessary to enforce

13

Finally we must weigh the extent to which this checkpoint "reasonably advances" its purposes.  The Court has admonished us that this is "not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger."[38]  Furthermore, we should give deference to the military's security concerns.[39]

Green asks us to examine afresh the base commander's decision that stopping every sixth car can be effective at preventing terrorism or keeping the roads (and thereby the personnel of the installation) safe from unlicenced drivers.  The response is common sense.  Stopping vehicles at regular intervals, rather than every one, first husbands the resources of law enforcement.  It also reasonably advances the purposes of the checkpoint because it deters individuals from driving while unlicenced and or transporting weapons and thereby endangering base personnel.[40]  It

a traffic regulation or the stop is based on suspicion of criminal activity."). Green's vague citation to this regulation, if it is even charitably construed as an argument, was not presented to the district court and does not represent reversible plain error, which requires (1) and "error," which is (2) "plain," (3) "affect[s] substantial rights," and (4) "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Smith*, 273 F.3d 629, 633 (5th Cir. 2001) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)).

[38] *Sitz*, 496 U.S. at 453.

[39] *Dep't of the Navy v. Egan*, 484 U.S. 518, 530 (1988) (stating that "unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs.").

[40] The same deterrence theory surely drives the recent adoption of random luggage searches at the nation's airports.

provides a gauntlet, random as it is, that persons bent on mischief must traverse.

IV

For the foregoing reasons, we conclude that this checkpoint's operation with respect to Green was reasonable, and therefore did not violate the Fourth Amendment.   AFFIRMED.