# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 18, 2020

Lyle W. Cayce
Clerk

No. 19-60294

United States of America,

*Plaintiff—Appellee*,

*versus*

Pavel Isaac Burgos-Coronado, *also known as* Pavel Isaac
Burgos Coronado,

*Defendant—Appellant*,

consolidated with

No. 19-60295

United States of America,

*Plaintiff—Appellee*,

*versus*

Javier Alejandro Moline-Borroto, *also known as* Javier
Alejandro Moline Borroto,

*Defendant—Appellant*,

CONSOLIDATED WITH

---

No. 19-60380

---

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

VALENTINA SYBREG CASTRO-BALZA, *also known as* VALENTINA SYBREG CASTRO BALZA,

*Defendant—Appellant*.

---

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 1:18-CR-70-3
USDC No. 1:18-CR-70-4
USDC No. 1:18-CR-70-7

---

Before CLEMENT, SOUTHWICK, and HIGGINSON, *Circuit Judges*.
LESLIE H. SOUTHWICK, *Circuit Judge*:

Defendants challenge the denial of their motion to suppress evidence, arguing police officers did not have reasonable suspicion that would allow prolonging their stop at a highway safety checkpoint. We AFFIRM.

FACTUAL AND PROCEDURAL BACKGROUND

Around midnight on May 18, 2018, State Troopers Gregory Bell, Matthew Minga, Andrew Beaver, and Steven Jones set up a "driver's safety checkpoint" on a highway approximately eight miles east of Starkville, Mississippi. The checkpoint was intended for the troopers to check for

No. 19-60294

driver's licenses, insurance, seat belt usage, and other safety matters. After approximately 15 to 20 minutes of light traffic, the troopers stopped a Toyota with a Florida license plate traveling north, occupied by the three defendants — Pavel Isaac Burgos-Coronado, Javier Alejandro Moline-Borroto, and Valentina Sybreg Castro-Balza. Trooper Minga approached the Toyota and made contact with the occupants. Trooper Bell, who was observing and overheard Trooper Minga's exchange with the Toyota occupants, identified Moline-Borroto as the driver, Burgos-Coronado in the rear driver-side seat, and Castro-Balza in the rear passenger-side seat. At a September 7, 2018 hearing on the defendants' motion to suppress, Trooper Bell described the exchange with the Toyota occupants:

> Trooper Minga asked the driver for his driver's license and proof of insurance. Mr. Borroto provided him a Florida temporary issue driver's license. And, at that time, I believe he said it was a rental vehicle. Trooper Minga asked him, then, who he had in the rear seat and who his passengers were.
>
> Mr. Borroto said something in Spanish to them, rolled down the back window; and Mr. Pavel [Burgos-Coronado] provided another temporary Florida driver's license; and Ms. Balza provided a Venezuela passport.

Bell subsequently answered some questions:

> Q. . . . [W]hen Trooper Minga asked about the other persons in the car, were you able to hear that?
>
> A. Yes, sir.
>
> Q. And what happened? How was the conversation between the passengers in the backseat?
>
> A. It was in Spanish between them.
>
> . . .

Q. Okay. And there was a conversation, then, between the people in the car or Trooper Minga with the persons in the backseat?

A. No. The driver of the vehicle with the persons in the backseat.

Q. And were you able to listen and determine whether it was in English or Spanish?

A. It was Spanish.

Q. Did you ever attempt to speak to the persons in the backseat of the Toyota?

A. I tried to, but we didn't — outside of basic conversation, Mr. [Moline-]Borroto pretty much translated anything we asked.

At the same hearing, Bell also testified that he started questioning Moline-Borroto only after the passengers gave Trooper Minga their identifications. Upon inspecting the Toyota occupants' identifications, Trooper Bell noticed that Castro-Balza's Venezuelan passport did not have a stamp indicating her entry into the United States.

Trooper Bell also testified that because of the seating arrangement within the Toyota — male driver, empty passenger seat, male occupant in rear driver-side seat, and female occupant in rear passenger-side seat — he had a concern about the trip being abnormal "[f]rom a human trafficking aspect."

About 25 to 30 seconds after the Toyota was stopped, a Volkswagen arrived at the checkpoint. Trooper Jones, who had been near Troopers Minga and Bell when the stop of the Toyota took place and had overheard discussion of a Venezuelan passport, talked to the occupants of the Volkswagen and noticed that it too had a Florida license plate, and he noted that the driver of the Volkswagen, Daniel Pena-Morales, also had a

Venezuelan passport.  When Trooper Jones informed Trooper Bell of the apparent connections between the two vehicles, Trooper Bell asked the driver of the Toyota, Moline-Borroto, if he was traveling with anyone.  After hesitation, Moline-Borroto responded that he was traveling with the individuals in the Volkswagen.  Trooper Jones asked the driver of the Volkswagen, Pena-Morales, the same question, to which Pena-Morales responded that he was not traveling with anyone.  According to Trooper Bell's testimony at the suppression hearing, these conflicting accounts put him on "high alert."  Ultimately, the troopers searched the Toyota and the Volkswagen and found evidence of credit card skimming in both.

A grand jury charged Burgos-Coronado, Moline-Borroto, and Castro-Balza — the Toyota occupants — as well as the Volkswagen occupants, with (1) conspiracy to commit offenses against the United States which affected interstate commerce; (2) possession with intent to defraud of an access device card encoder, software, and computer; (3) possession with intent to defraud of credit card skimming equipment; (4) possession with intent to defraud of 15 or more unauthorized access devices; and (5) using or attempting to use with intent to defraud more than one unauthorized access device to obtain goods, services, and money aggregating in excess of $1,000.

The defendants from both vehicles moved to suppress the evidence based on an unconstitutional search and seizure.  The district court denied the motions.  Pursuant to plea agreements, Burgos-Coronado, Moline-Borroto, and Castro-Balza entered conditional guilty pleas, reserving the right to appeal the denial of their motions to suppress.  They were sentenced and entered separate notices of appeal.  We granted an unopposed motion to consolidate these three defendants' appeals for briefing and oral argument purposes.  We denied the Government's opposed motion to consolidate the Toyota occupants' appeals with similar appeals filed by the Volkswagen occupants.  On January 29, 2020, we affirmed the district court's denial of

the motions to suppress with respect to the Volkswagen occupants. *See United States v. Pena-Morales*, 791 F. App'x 499 (5th Cir. 2020). We now AFFIRM in the companion cases.

## DISCUSSION

Our review of a denial of a motion to suppress evidence requires us to examine factual findings for clear error but to consider conclusions of law *de novo*; a determination about the existence of reasonable suspicion is a legal conclusion. *United States v. Freeman*, 914 F.3d 337, 341 (5th Cir. 2019). "We view the evidence in the light most favorable to the party prevailing below." *Id.* We will uphold the district court's ruling if there is any reasonable view of the evidence to support it. *See id.* at 342.

"A checkpoint-type stop of an automobile is a seizure constrained by the Fourth Amendment." *United States v. Green*, 293 F.3d 855, 857–58 (5th Cir. 2002). While suspicionless seizures are ordinarily unreasonable, and thus Fourth Amendment violations, certain types of automobile checkpoint stops have been excepted from this general rule. *Id.* at 858. The Supreme Court has suggested that such checkpoints designed to check a driver's license and registration are permissible. *See id.* (citing *Delaware v. Prouse*, 440 U.S. 648, 663 (1979)). We have explained that "it is a legitimate, programmatic purpose that justifies a checkpoint stop made without any suspicion." *United States v. Machuca-Barrera*, 261 F.3d 425, 433 (5th Cir. 2001). We examine the available evidence to determine the "primary purpose" of a checkpoint; "a program driven by an impermissible purpose may be proscribed while a program impelled by licit purposes is permitted." *City of Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000). "[T]he primary purpose of a checkpoint is a finding of fact reviewed for clear error." *Green*, 293 F.3d at 859.

Though the evidence of the programmatic purpose of the checkpoint here was scant, Trooper Bell testified that the troopers were stopping every car that passed to check for driver's licenses, insurance, seat belt usage, and other "safety aspects." The district court's finding "that the purpose of the checkpoint" was to "check[] licenses, insurance, and seatbelts" was not clearly erroneous. Seizures carried out at "general crime control" checkpoints are justified only if accompanied by "some quantum of individualized suspicion." *Edmond*, 531 U.S. at 47. In contrast, the "suspicionless" checkpoint here was permissible because it served a legitimate programmatic purpose closely related to the necessity of ensuring roadway safety and "problem[s] peculiar to the dangers presented by vehicles." *Green*, 293 F.3d at 858.

Inquiries relating to safety, much like those at a regular non-checkpoint traffic stop, might include checking the driver's license of the driver, determining whether there are outstanding traffic-related warrants against the driver, and inspecting an automobile's registration and proof of insurance, *i.e.*, inquiries "ensuring that vehicles on the road are operated safely and responsibly." *Rodriguez v. United States*, 575 U.S. 348, 355 (2015). Seizures carried out pursuant to that purpose are permissible, at least at their inception, under the Fourth Amendment. *See Green*, 293 F.3d at 858.

In the context of immigration checkpoints, we have held that "the permissible duration of the stop is limited to the time reasonably necessary to complete a brief investigation of the matter within the scope of the stop." *Machuca-Barrera*, 261 F.3d at 433. The primary purpose of the checkpoint stop here was not related to immigration, but the inquiry remains the same. "The key is the rule that a stop may not exceed its permissible duration unless the officer has reasonable suspicion." *Id.* at 434. This means that if the initial inquiries generate reasonable suspicion of other criminal activity, even if not related to the primary purpose of the checkpoint, the stop may be

lengthened to accommodate the new justification. *Id.* It is thus permissible for an officer to prolong a detention until the officer has dispelled the newly-formed suspicion. *United States v. Glenn*, 931 F.3d 424, 429 (5th Cir.), *cert. denied*, 140 S. Ct. 563 (2019).

A reasonable suspicion consists of "specific and articulable facts . . . taken together with rational inferences from those facts" that reasonably suggest "criminal activity [is] afoot." *United States v. Escamilla*, 852 F.3d 474, 480–81 (5th Cir. 2017) (alteration in original) (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 30 (1968)). Although reasonable suspicion cannot consist simply of an officer's hunch that an individual is engaged in illegal activity, only "some minimal level of objective justification" is required. *United States v. Broca-Martinez*, 855 F.3d 675, 678 (5th Cir. 2017) (quotation marks omitted). In our review, we must consider the "totality of the circumstances" that confronted the law enforcement officer. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Observations that by themselves are susceptible to innocent explanations, when taken together, can still amount to reasonable suspicion. *Id.* at 274–75. "In considering whether officers reasonably suspect someone of criminal activity, we defer to their law enforcement experience, recognizing that trained officers may draw inferences from certain facts 'that might well elude an untrained person.'" *Escamilla*, 852 F.3d at 481 (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

Our inquiry is thus whether reasonable suspicion of criminal activity arose before the time reasonably necessary to satisfy the purpose of this stop had expired. In our inquiry, we do not expand on the arguments made by the defendants in the district court. The motion to suppress jointly filed by these defendants contains the following assertions about the events after Moline-Borroto stopped the Toyota at the checkpoint. "The officer then asked for his identification and registration of the vehicle. Mr. Moline-Borroto handed

a valid Florida's driver license to the officer and the rental agreement for the car. The passengers in the vehicle also produced valid identification. At this point, the vehicle should have been waved through the stop and allowed to proceed."

Making the temporal point even clearer, at the suppression hearing, the district court judge asked counsel for each of the Toyota occupants to state exactly when the seizure became illegal. Counsel for Moline-Borroto responded that the seizure became illegal "[t]he moment that the officer sees the passengers with seat belts on, and that the driver has given him a license that seems to be valid and has said I'm going to Memphis to see my uncle, at that point, continued questioning I do not think was justified under the law." The statement about a trip to Memphis was in response to Trooper Bell's initial questioning. Counsel for Burgos-Coronado said she would "echo everything" in that answer, and counsel for Castro-Balza said he "would simply adopt the remarks" already made.

The relevant point identified by counsel was after those in the backseat of the Toyota gave their identifications to Trooper Minga. Thus, defendants did not contest the validity of any of Trooper Minga's earlier actions. At the time Trooper Bell began questioning Moline-Borroto, the record shows that the following facts were known to the troopers: (1) the time was soon after midnight, (2) the Toyota had an out-of-state license plate, (3) the driver of the Toyota had a temporary driver's license, (4) that temporary driver's license was also out-of-state, (5) the driver had not yet provided registration or proof of insurance but claimed the vehicle was a rental, (6) the driver was a man, the passenger seat was unoccupied, and there was man and woman occupying the rear seats, (7) the driver began translating to the passengers in Spanish, (8) the male passenger produced another out-of-state temporary driver's license, and (9) the woman passenger produced a Venezuelan passport with no entry stamp.

No. 19-60294

CONSOLIDATED WITH 19-60295, 19-60380

We must view the evidence in the light most favorable to the party that prevailed below, *i.e.*, the prosecution. *United States v. Pack*, 612 F.3d 341, 347 (5th Cir. 2017). In doing so, we recognize that each of the articulated facts is consistent with an innocent explanation. That, though, is not enough to rule out reasonable suspicion. *See Arvizu*, 534 U.S. at 274–75. The collection of information was that a female passenger's passport lacked an entry stamp, which might reasonably suggest that she was in the country illegally. Further, the abnormal seating arrangement — abnormal because the officer believed multiple adults do not usually choose to sit in the back when the passenger seat is empty — when combined with the unstamped passport and the late hour, might suggest that the woman was being held against her will.

Based on these facts, the troopers had the "minimum level of objective justification" to support reasonable suspicion of criminal activity — namely, human trafficking— sufficient to justify prolonging the stop by inquiring further about where the Toyota occupants were going. During that justified extension, more facts were discovered supporting reasonable suspicion and, eventually, supporting a search.

AFFIRMED.